LEA COMPANY v. NORTH CAROLINA BOARD OF TRANSPORTATION

No. 397PA82

(Filed 7 July 1983)

1. Constitutional Law § 1.1— authority to construe N.C. Constitution and laws

Only the N.C. Supreme Court may authoritatively construe the Constitution and laws of North Carolina with finality, and decisions of the N.C. Supreme Court in this regard are binding upon the U.S. Supreme Court and all other courts.

2. Eminent Domain § 13— highway structures—easement for flooding—foreseeability of 100 year flood

In an inverse condemnation action seeking damages for an easement for flooding allegedly taken by defendant Board of Transportation by its construction of certain highway structures, the evidence supported findings by the trial court that a 100 year flood which occurred on 1 September 1974 was a reasonably foreseeable event and that the increased flooding which damaged plaintiff's property on that date was the direct and foreseeable result of the structures constructed by defendants.

3. Negligence § 1.1— meaning of "Act of God"

The statement in *Midgett v. Highway Commission*, 260 N.C. 241 (1963) that the term "Act of God" in its legal sense "applies only to events in nature so extraordinary that the history of climatic variations and other conditions in the particular locality affords no reasonable warning of them" is disapproved, since such statement incorrectly implies that an "Act of God" is by definition an unforeseeable event.

4. Eminent Domain § 13; Negligence § 1.1— easement for flooding—"Act of God" not determinative of liability

The holding in *Midgett v. Highway Commission*, 260 N.C. 241 (1963) that, in order to recover damages for an easement for flooding, the plaintiff must show that the flood in question was not an Act of God is overruled, since the liability of defendant is not determined by whether the flood was an Act of God but is controlled by a determination of whether the flood was a reasonably foreseeable event.

5. Eminent Domain § 13— easement for flooding—injury as foreseeable result of highway structures

Injury from flooding may properly be found to be a foreseeable direct result of government structures when it is shown that the increased flooding

causing the injury would have been the natural result of the structures at the time their construction was undertaken.

**6. Eminent Domain § 2.6— easement for flooding—frequency of flooding**

It is not required that flooding caused by government structures be shown to occur with any particular frequency before a taking will have occurred, it being sufficient to show that plaintiff's property is subject to permanent liability to intermittent but inevitably recurring overflows.

**7. Eminent Domain § 2.6— easement for flooding—frequency of flooding—use of property**

The frequency of flooding which will constitute a taking generally will vary with the use to which the property is put.

**8. Eminent Domain § 2.6— highway structures—taking of easement for flooding**

The trial court did not err in concluding that the increased flooding directly resulting from defendant Board of Transportation's highway structures was a permanent invasion of plaintiff's property and a taking by the State where the evidence tended to show that the structures built and maintained by defendant caused increased flooding and substantial injury to plaintiff's relatively high density apartments in an urban area; the increased flooding on plaintiff's property will occur with a statistical return frequency of from once in every 26 years to once in every 100 years; and the highway structures built and maintained by defendant were permanent in nature.

**9. Eminent Domain §§ 2.6, 5.8— easement for flooding—evidence of damages**

In an inverse condemnation action seeking damages for an easement for flooding, evidence of plaintiff's repair costs and lost present and future rental income was relevant upon the issue of whether there had been a taking and could perhaps be shown to influence what a willing buyer would pay a willing seller for the property, but such repair costs and lost income could not be directly recovered as damages. However, the trial court properly found that plaintiff made a prima facie showing of substantial and measurable damages where plaintiff offered evidence that the monetary value of its property immediately after the taking was substantially less than it had been immediately before the taking.

**10. Eminent Domain § 2.6— easement for flooding—maximum and minimum boundaries of easement taken**

The evidence supported the trial court's determination that plaintiff should receive compensation for injury to its property arising from increased flooding directly caused by defendant's highway structures beginning with the level of increased flooding associated with a 26 year flood and ending with the level of increased flooding associated with a 100 year flood.

**11. Eminent Domain § 2.6— easement for flooding—maximum boundaries of easement taken**

Injury from increased flooding foreseeably and directly resulting from structures built and maintained by the State, but occuring above the level of increased flooding such structures would cause during a 100 year flood, may

Lea Co. v. N. C. Board of Transportation

not be included as a part of a taking by the State, since evidence concerning damage resulting from increased flooding above the level of increased flooding the State's structures would cause during a 100 year flood is inherently too speculative and remote in its nature to be relied upon by our courts.

**12. Eminent Domain § 2.6; Nuisance § 1— easement for flooding—inapplicability of doctrine of moving to the nuisance**

The doctrine of "moving to the nuisance" or "priority of occupation" has no applicability in an action against the State for a taking by flooding directly caused by permanent structures constructed by the State.

**13. Eminent Domain § 2.6— easement for flooding taken on certain date—evidence of flooding on subsequent occasions—disregard by trial court**

While evidence tending to show flooding of plaintiff's property on four occasions subsequent to a flood on 1 September 1974 was incompetent with regard to the issue of whether a taking had occurred as the result of the flood of 1 September 1974, it is clear that the trial court was not influenced by such incompetent evidence where the findings, conclusion and judgment of the trial court clearly indicated that the court relied upon competent scientifically approved statistical data based upon actual measurements of high water levels occurring at the site in question during the 1 September 1974 flood in determining that the increased flooding caused by defendant's highway structures comprised a taking.

**14. Eminent Domain § 13.4— inverse condemnation action—easement for flooding—calculations of flood levels by plaintiff's experts**

In an inverse condemnation action to recover damages for an easement for flooding allegedly taken from plaintiff by defendant as a result of flooding on 1 September 1974 caused by defendant's highway structures, evidence of calculations of flood levels by plaintiff's experts was not incompetent because construction of the highway structures was not completed until after the flood where many of the calculations made by plaintiff's experts were based upon measurements of actual high water levels during the 1 September 1974 flood which were made and recorded by a witness for defendant, and where there was evidence of substantial similarities existing at the time of the 1 September 1974 flood and all later periods.

**15. Evidence § 47.1— expert testimony—statement of facts as basis for opinion**

The trial court did not abuse its discretion in requiring defendant's expert witness to relate the underlying facts he used in making calculations and computations upon which he based his opinion before giving his opinion or in excluding his opinion when he was unable to present the documentation which comprised the facts underlying his opinion.

**16. Eminent Domain § 13— easement for flooding—inverse condemnation action—statute of limitations**

The evidence supported the trial court's determination that the injury to plaintiff's property from excess flooding was the direct result of the combination of defendant's highway structures in place on 1 September 1974, although there was some evidence that flooding had occurred on plaintiff's property dur-

ing the 1940's and 1950's. Therefore, plaintiff's commencement of an inverse condemnation action on 30 May 1975 was within the applicable statute of limitations of G.S. 136-111.

**17. Eminent Domain § 13; Judgments § 37.5— consent judgment in condemnation action—no bar to damages for easement for flooding**

Plaintiff's inverse condemnation action to recover damages for an easement for flooding allegedly taken by defendant Board of Transportation by its construction of certain highway structures was not barred by a consent judgment entered in the prior condemnation action in which defendant took a small portion of plaintiff's property for the highway project, particularly by language stating that the judgment included "any and all damages" caused by the highway project, since neither the interest nor the area involved in the taking by flooding were within the contemplation of the parties when they agreed to and signed the consent judgment.

**18. Eminent Domain § 13— ongoing condemnation proceedings—separate inverse condemnation action**

Property owners are not required to seek to recover compensation in ongoing condemnation proceedings for a subsequent further taking by the State but may bring a separate action for inverse condemnation pursuant to G.S. 136-111 when there is a further taking by the State after the initiation of the original condemnation action. However, injuries accruing to the remaining property caused by the original taking by condemnation, including injuries resulting from the condemnor's use of the previously taken portion, are not compensable in an inverse condemnation action unless they are so great as to amount in themselves to a separate taking.

Justice FRYE did not participate in the consideration or decision of this case.

ON discretionary review, pursuant to G.S. 7A-31, of the decision of the Court of Appeals, 57 N.C. App. 392, 291 S.E. 2d 844 (1982), affirming judgment for the plaintiff by *McLelland, J.,* 3 November 1980, Superior Court, GUILFORD County.

The plaintiff brought this inverse condemnation action and sought damages for an easement for flooding allegedly taken by the defendant when it constructed certain highway structures. The plaintiff alleged that the defendant's structures foreseeably increased the level of flooding on the plaintiff's property and resulted in substantial damage to its apartments on the property. Following trial without a jury, the trial court adjudged that the highway structures constructed and maintained by the defendant had increased the flooding of the plaintiff's property during a flood on 1 September 1974 and that the defendant had taken a defined interest in the plaintiff's property as a result. The trial

court ordered that just compensation for the taking of the plaintiff's property be determined by a jury. The defendant appealed to the Court of Appeals which affirmed the judgment of the trial court. The defendant's petition for discretionary review pursuant to G.S. 7A-31 was allowed by the Supreme Court on 26 August 1982.

*Turner, Enochs and Sparrow, P.A., by C. Allen Foster, for plaintiff appellee.*

*Rufus L. Edmisten, Attorney General, by James B. Richmond, Special Deputy Attorney General, and Nichols, Caffrey, Hill, Evans and Murrelle, by Lindsay R. Davis, Jr., for defendant appellant.*

MITCHELL, Justice.

This case presents two basic issues for our consideration. The first issue is whether an easement for flooding was taken from the plaintiff by the defendant, a State agency. The second involves whether the plaintiff retained its right to compensation in this action in light of a prior consent judgment and other facts. We hold that there was a taking by the defendant and that the plaintiff is entitled to compensation.

The evidence introduced at trial tended to show *inter alia* the following: In 1972, the plaintiff, Lea Company, sought to acquire real property for the construction of apartments in the vicinity of Greensboro, North Carolina. During the summer of 1972, Lea Company purchased two contiguous parcels of undeveloped land near the junction of United States Interstate Highway 40 [hereinafter "I-40"] and High Point Road. The property lay several hundred feet to the northwest of the junction and was bisected by South Buffalo Creek. Shortly after purchasing the property, Lea Company began construction of the La Mancha Apartments, a 224 unit apartment complex, on a portion of the property.

On 6 November 1973, the defendant in this case, the North Carolina Board of Transportation[1] [hereinafter "BOT"], notified

---

1. This action was brought against the former Board of Transportation on 30 May 1975. Effective 1 July 1975, the Department of Transportation was created.

Lea Company that it was condemning certain property owned by Lea Company. The property interest being condemned consisted of fee title to a portion of land at the southern boundary of the plaintiff's property to be used for lateral support and construction in connection with highway improvements to be made at the interchange of I-40 and High Point Road. BOT instituted a civil action in 1973 against Lea Company in connection with this condemnation. After the filing of the complaint and declaration of taking in that case, BOT and Lea Company negotiated a compromise settlement. Counsel for BOT prepared and signed a consent judgment and sent it to counsel representing Lea Company in that action on 25 April 1974. Counsel for Lea Company and others involved in that action signed the consent judgment at later times. The consent judgment was signed by Honorable Charles T. Kivett, Superior Court Judge, on 6 September 1974. It was recorded in the Office of the Register of Deeds of Guilford County on 9 December 1974. Later that month the Clerk of Superior Court of Guilford County caused payment to be made to Lea Company in accord with the consent judgment.

On 1 September 1974 there was a heavy rainfall in the Greensboro area including the watershed of South Buffalo Creek upstream from the La Mancha Apartments. The waters of the creek rose above the banks and flooded parts of the La Mancha Apartments causing extensive damages.

Prior to 1955, High Point Road was part of the State highway system. It was built on a raised roadbed constructed of soil with a culvert passing through the roadbed to allow the waters of South Buffalo Creek to pass through. When I-40 was constructed, an interchange between I-40 and High Point Road was built. That interchange was a partial cloverleaf with an access ramp (Ramp B) in the northwest quadrant of the intersection of I-40 and High Point Road. Ramp B was also constructed on a raised bed of soil containing culverts to permit the waters of South Buffalo Creek to pass through at a point where the ramp

N.C. Sess. Laws 1975, c. 716, s. 1. Effective 1 July 1977, G.S. 143B-348 was amended to state in pertinent part that: "All actions pending in court by or against the Board of Transportation may continue to be prosecuted in that name without the necessity of formally amending the name to the Department of Transportation." Throughout this opinion we refer to the defendant as the "Board of Transportation" or "BOT."

crossed the creek. High Point Road was reconstructed over a raised roadbed with culverts to carry the waters of the creek through the point at which the raised soil roadbed crossed the creek.

In 1969, BOT designed an additional access ramp (Ramp A) to be located in the northeast quadrant of the intersection of I-40 and High Point Road. The initial stages of this construction project were undertaken in 1972. Construction of an extension (Y-3) of the High Point Road culvert, together with construction of the Ramp A culvert, was substantially completed on 24 July 1974. Although construction of an extension of the Ramp B culvert was not completed until some time after the 1 September 1974 flood, the opening in Ramp B which was to contain the extension of that culvert had been completed on 1 September 1974.

The plaintiff, Lea Company, instituted this action against BOT on 30 May 1975 alleging a cause of action against BOT under Chapter 136 of the General Statutes of North Carolina for the taking of an easement for flooding on or across Lea Company's property. The plaintiff alleged that High Point Road and ramps between High Point Road and I-40 are obstructions to South Buffalo Creek and that BOT had placed culverts under the structures which "are completely inadequate to carry the waters of South Buffalo Creek resulting from induced excessive runoff and caused the water level to be substantially higher upstream from the culverts than it would be if the drainage openings were adequate." Lea Company also alleged that these structures as constructed "constitute a dam across South Buffalo Creek impeding and diverting the natural flow of its waters and causing its waters to back up and flood Plaintiff's property." Lea Company also alleged that its property would continue to be flooded periodically by reason of the structures constructed by BOT and that there had been a taking of its property by BOT. Other evidence introduced at trial will be discussed hereinafter where it is pertinent.

The action was tried before Judge McLelland without a jury on all issues raised by the pleadings except the issue of the appropriate amount of damages. Judgment was entered by the trial court in favor of the plaintiff and against the defendant and it was ordered that the issue of just compensation be determined by

a jury. The defendant appealed. The Court of Appeals, in an opinion by Judge Whichard with Judges Clark and Arnold concurring, affirmed the judgment of the trial court. The defendant then petitioned this Court for discretionary review pursuant to G.S. 7A-31. We allowed the defendant's petition on 26 August 1982. We now affirm the decision of the Court of Appeals.

## I.

The defendant, BOT, assigns as error the determination of the trial court that an easement for flooding was taken as a result of flooding caused by its highway structures. In support of this assignment, the defendant refers us to numerous cases decided by the Supreme Court of the United States or by lower Federal Courts.

[1] The cases decided by the Supreme Court of the United States address the issue of whether there has been a taking for which compensation is required by the Fourteenth Amendment to the Constitution of the United States. The Supreme Court of the United States is the unchalleged final judicial authority in construing the Constitution of the United States. The same is not true, however, with regard to questions of state law. Only this Court may authoritatively construe the Constitution and laws of North Carolina with finality. *Watch Co. v. Brand Distributors*, 285 N.C. 467, 474, 206 S.E. 2d 141, 146 (1974). Our decisions in this regard are binding upon the Supreme Court of the United States and all other courts. *See Missouri v. Hunter*, --- U.S. ---, 74 L.Ed. 2d 535, 103 S.Ct. 673 (1983).

In construing the Constitution of North Carolina, we have previously stated that:

> We recognize the fundamental right to just compensation as so grounded in natural law and justice that it is part of the fundamental law of this State, and imposes upon a governmental agency taking private property for public use a correlative duty to make just compensation to the owner of the property taken. This principle is considered in North Carolina as an integral part of "the law of the land" within the meaning of Article I, Section 19 of our State Constitution.

*Long v. City of Charlotte*, 306 N.C. 187, 196, 293 S.E. 2d 101, 107-108 (1982). In addressing the question of whether the trial

court in the present case erred in its determination that the defendant has taken an easement for flooding in the plaintiff's property requiring that just compensation be paid, we attempt to interpret and correctly apply the decisions of the Supreme Court of the United States which authoritatively construe the Four-teenth Amendment to the Constitution of the United States. We emphasize, however, that our reasoning and holding with regard to the issue of whether there has been a taking by the State re-quiring compensation in this case are expressly based upon our interpretations of *both* the Constitution of the United States and the Constitution of North Carolina.

In *Midgett v. Highway Commission*, 260 N.C. 241, 248, 132 S.E. 2d 599, 606-607 (1963) [hereinafter *"Midgett I"*], we applied long established principles of law and held that:

> There need not be a seizure of the property or dispossession of the owners; it is a taking if the value is substantially im-paired. *McKinney v. High Point*, 237 N.C. 66, 74 S.E. 2d 440. Permanent liability to intermittent, but inevitably recurring, overflows constitutes a taking. 18 Am. Jur., Eminent Domain, s. 134, pp. 759, 760. In order to create an enforceable liability against the government it is, at least, necessary that the overflow of water be such as was reasonably to have been an-ticipated by the government, to be the *direct* result of the structure established and maintained by the government and constitute an actual permanent invasion of the land or a right appurtenant thereto, amounting to an appropriation of and not merely an injury to the property. *Sanguinetti v. United States*, 264 U.S. 146 (1924). (Emphasis in original.)

These principles are controlling in the present case. Bearing them in mind, we turn to a brief review of some of the competent evidence introduced at trial and pertinent to this assignment of error.

Some of the evidence before the trial court tended to show that BOT sent a representative, Jerry Peede, to the site several days after the 1 September 1974 storm and flooding. He observed and measured high water marks left by the flooding and recorded his observations in a notebook. His notebook was introduced at trial by Lea Company together with a graph he had prepared rep-resenting flooding and other movements of water in the area of

the plaintiff's property associated with the storm. Peede also testified concerning these matters.

Dr. Frank L. Parker, a professor of Environmental and Water Resources Engineering at Vanderbilt University who has published in excess of one hundred and thirty articles and books concerning water behavior and systems, calculated the flow of water at Ramp A on the occasion of the 1 September 1974 flood. Using Peede's notes and other information supplied by BOT, he was able to calculate the volume and velocity of water in the area of Ramp A at the time of the flooding. He was then able to calculate the level of flooding associated with that flow of water and its probable return frequency.

Dr. Parker performed these calculations by accepted scientific methods which included plotting on a graph the actual maximum recorded flows in the stream in question as measured by official United States Geological Survey water gauges maintained on the stream over a period of years. Using this information concerning actual flows and water levels in the stream, Dr. Parker applied mathematical principles to show the probability of various unrecorded flows and levels by the use of a statistically derived curve. This curve was similar to the standard "bell shaped" curve for standard distribution and is known as the Pearson Log Type III curve. By referring to this curve, Dr. Parker could determine the flow and levels of water associated with a flood of any given return frequency at the gauging station. He could then use an equation based upon mathematical technique known as regression analysis to determine the magnitude of flooding at the construction site upstream from the gauge and the frequency with which any particular level of flooding at the construction site was statistically likely to return. Dr. Parker's results from such methods were also corroborated by results he obtained using different methodologies advocated by hydrologists and described in published literature.

Dr. Parker's calculations indicated that the flood occurring at the site on 1 September 1974 was higher than that which would be experienced during a flood of a return frequence of once in one hundred years. Dr. Parker testified that the one hundred year flood is a concept regularly used in the science of hydrology and well known to professionals in this field. This testimony was cor-

roborated by BOT's witnesses and witnesses from the United States Army Corps of Engineers. The evidence indicated that a one hundred year flood is a flood of a return frequency of once in each one hundred years, or which can be anticipated statistically to occur once in a period of one hundred years. Stated otherwise, there is a one percent chance of a one hundred year flood occurring in any given year.

Evidence was introduced tending to show that, both before and after the modifications of 1972-1974, the culverts at the interchange were inadequate to accommodate the waters associated with a fifty year flood. Based upon a computer program developed by the United States Army Corps of Engineers and widely used and accepted as authoritative by hydrologists, computations were made which determined the high water level which would be experienced at the La Mancha Apartments during flood with various statistical return frequencies. These computations were made to compute the levels of flooding which would be experienced if the natural flow of South Buffalo Creek had been undisturbed by the interference caused by the combined effects of Ramp A, Y-3 and Ramp B.

Similar computations were made to determine the level of high water which would occur at the La Mancha Apartments with Ramp A, Y-3 and Ramp B in place. A comparison of the two sets of calculations tended to show the number of *additional* feet the high water level would rise as a result of the defendant's structures during a flood of any given return frequency. This evidence further tended to show that the *increase* in the high water level caused by Ramp A, Y-3 and Ramp B would begin to flood units of the La Mancha Apartments during high water levels associated with a flood statistically predictable to occur once in every twenty-six years — a twenty-six year flood. Evidence was also introduced tending to show the amount of additional flooding which would be experienced in the La Mancha Apartments as a result of *increased* high water levels caused by the structures built by BOT, to and including the increased high water levels which would be experienced during a one hundred year flood. The evidence tended to show that the flooding which actually occurred in the La Mancha Apartments on 1 September 1974 reached all of these levels.

A.

[2]  In order to recover in the present case, the plaintiff was required to show that the increased overflow of water was such as was reasonably to have been anticipated by the State to be the direct result of the structures it built and maintained. *Midgett I,* 260 N.C. at 248, 132 S.E. 2d at 606-607. In order to show this, the plaintiff must show that both the magnitude of the flood of 1 September 1974 and any increased flooding directly caused by the State's structures during that flood were reasonably foreseeable by the State at the time it undertook to erect the structures.

The trial court made findings of fact supported by and substantially in accord with the evidence introduced at trial as previously outlined in this opinion. The trial court determined *inter alia:*

> 5. The construction of Ramp A in conjunction with the existence of Ramp B and Y-3 directly and proximately caused plaintiff substantial damage to its La Mancha property on September 1, 1974 by directly and proximately causing the property to be flooded to a substantially greater depth than it would have experienced on that occasion had Ramp B and Y-3 not been extended and had Ramp A not been constructed. By reason of the foregoing, defendant has taken an interest in plaintiff's property for which plaintiff is entitled to just compensation.

> 6. The construction of Ramp A in conjunction with the existence of Ramp B and Y-3 will continue to directly and proximately cause plaintiff substantial damage by raising the level of flooding otherwise to be expected on the property by a substantial amount every time a flood of a return frequency of between 26 and 100 years is experienced at the site, which floods are reasonably foreseeable and recurring events. By reason of the foregoing, defendant has taken an interest in plaintiff's property for which plaintiff is entitled to just compensation.

> . . . .

> 12. The interest taken by defendant is an easement for the accommodation of those flood waters in excess of those which would have been experienced on the site had the struc-

tures identified as Y-3, Ramp B, and Ramp A not been constructed, maintained, and/or extended.

13. The amount of excess waters by which plaintiff's property is burdened varies with the magnitude of flood waters experienced by South Buffalo Creek. The interest taken by defendant is maximally defined as that surcharge of waters which would be experienced at the property on the occasion of the 100 year flood, which flood is a reasonably foreseeable and recurring event. The maximum lateral extent and height of flooding associated with such a flood at the location of plaintiff's property are approximately those which were experienced on September 1, 1974.

The defendant BOT contends that the trial court erred in determining (1) that the one hundred year flood which occurred on 1 September 1974 was a reasonably foreseeable event, and (2) that the increased flooding which damaged the plaintiff's property on that date was the direct and foreseeable result of the structures constructed by BOT. We address each of these contentions separately.

The trial court did not err in determining that the one hundred year flood which occurred on 1 September 1974 was a reasonably foreseeable event. The defendant concedes that a one hundred year flood is by definition one which may be statistically predicted to occur once in every one hundred years. Nevertheless, the defendant contends that floods which can be anticipated to occur only once every one hundred years are "Acts of God" and not such as to be reasonably anticipated by the State.

[3] We have stated that, "[t]he term 'Act of God,' in its legal sense, applies only to events in nature so extraordinary that the history of climatic variations and other conditions in the particular locality affords no reasonable warning of them." *Midgett I,* 260 N.C. at 247, 132 S.E. 2d at 606. We now reject and disapprove that statement, as we believe that it incorrectly implies that an "Act of God" is by definition an unforeseeable event. Such is not the case.

The term "Act of God" is more correctly defined as follows:

An act occasioned exclusively by violence of nature without the interference of any human agency. It means a

natural necessity proceeding from physical causes alone without the intervention of man. It is an act, event, happening, or occurrence, due to natural causes and inevitable accident, or disaster; a natural and inevitable necessity which implies entire exclusion of all human agency which operates without interference or aid from man and which results from natural causes and is in no sense attributable to human agency. It is an accident which could not have been occasioned by human agency but proceeded from physical causes alone.

Black's Law Dictionary, 31 (rev. 5th ed. 1979). We accept and adopt this definition as our own.

[4] Based upon this correct definition of the term "Act of God," we reject and overrule our holding in *Midgett I* that the plaintiff must show that the flood in question was not an Act of God. 260 N.C. at 247, 132 S.E. 2d at 606. The 1 September 1974 flood was an Act of God. That fact is not, however, determinative of the issue of the liability of the defendant. The liability *vel non* of the defendant is controlled by the determination of whether the one hundred year flood experienced on 1 September 1974 was a reasonably foreseeable event. It remains true that an unforeseeable flood is one the coming of which is not to be anticipated from the usual course of nature. A reasonably foreseeable flood is one, the repetition of which, although at uncertain intervals, can be anticipated. *Id.*

The evidence in the present case tended to show that floods of a magnitude occurring once in every one hundred years under the conditions shown to exist in the particular locality which is the subject of this case were statistically reasonably foreseeable by those familiar with the science of hydrology. Whether such floods were in fact reasonably foreseeable by the State was a question for the trier of fact with the burden of proof being upon the plaintiff. The evidence supported the trial court's findings with regard to the reasonable foreseeability of the one hundred year flood experienced in the present case, and those findings are binding upon us on appeal. *Williams v. Insurance Co.*, 288 N.C. 338, 218 S.E. 2d 368 (1975).

[5] In addition, the trial court did not err in determining that the injury to the plaintiff's property by increased flooding during the 1 September 1974 flood was a *foreseeable direct result* of the

structures constructed by the defendant. *Midgett I,* 260 N.C. at 248, 132 S.E. 2d at 607. Injury properly may be found to be a foreseeable direct result of government structures when it is shown that the increased flooding causing the injury would have been the natural result of the structures *at the time their construction was undertaken.* Injury caused in substantial part by subsequent or contemporaneous acts or construction by others is not a direct result of the government structures. A showing of injury caused by such subsequent or contemporaneous acts or construction will not support a finding that there has been a taking by the State. To require the State to anticipate the shifting of business and population centers and the attendant acts or construction by others contemporaneous with or subsequent to the State's construction, and to hold the State liable for a taking if it fails to do so, would place an unreasonable and unjust burden upon public funds. No such result is required by the Constitution of the United States or the Constitution of North Carolina.

Thus, it is important to note that in the present case both parties contended that the flooding on 1 September 1974 occurred almost exactly at the time of the completion of the defendant's construction. All of the evidence introduced was to this effect. No contention was made and no evidence was offered tending to show that any acts or construction by others contemporaneous with or subsequent to the defendant's construction had a substantial effect upon the injury to the plaintiff's property. Competent evidence was introduced which tended to show that the defendant's structures substantially increased the level of flooding which would have been experienced had the structures not been built. The evidence also tended to show the specific increases in flooding which would be caused on the plaintiff's property by the defendant's structures during floods of varying and statistically foreseeable return frequency. The evidence tended to show that the injury to the plaintiff's property by increased flooding was that which would naturally result from the defendant's structures *at the time construction was undertaken.* This was sufficient evidence in the present case to support the trial court's finding that the increased flooding of the plaintiff's property on 1 September 1974 was the foreseeable direct result of the structures established and maintained by the State. *Midgett v. Highway Commission,* 265 N.C. 373, 144 S.E. 2d 121 (1965)

[hereinafter *"Midgett II"*]. *See United States v. Cress,* 243 U.S. 316, 61 L.Ed. 746, 37 S.Ct. 380 (1917). *But see Sanguinetti v. United States,* 264 U.S. 146, 68 L.Ed. 608, 44 S.Ct. 264 (1924), *and Christman v. United States,* 74 F. 2d 112 (7th Cir. 1934).

B.

[6]  In order to recover for a taking in the present case, the plaintiff must additionally show that the defendant's structures caused an actual permanent invasion of the plaintiff's land or a right appurtenant thereto. The defendant contends that the increased flooding on the plaintiff's property which will occur with a statistical return frequency of from once in every twenty-six years to once in every one hundred years is not sufficiently "frequent" to constitute a taking.

"Permanent liability to intermittent, but inevitably recurring, overflows constitutes a taking." *Midgett I,* 260 N.C. at 248, 132 S.E. 2d at 606. As the Supreme Court of the United States has stated:

> There is no difference of kind, but only of degree, between a permanent condition of continual overflow by back-water and a permanent liability to intermittent but inevitably recurring overflows; and, on principle, the right to compensation must arise in the one case as in the other. If any substantial enjoyment of the land still remains to the owner, it may be treated as a partial instead of a total divesting of his property in the land. The taking by condemnation of an interest less than the fee is familiar in the law of eminent domain.

*United States v. Cress,* 243 U.S. 316, 328-329, 61 L.Ed. 746, 753, 37 S.Ct. 380, 385 (1917).

The defendant contends, however, that in order to be permanent and constitute a taking such overflows must also be "frequent." The defendant relies primarily upon the authority of *Fromme v. United States,* 412 F. 2d 1192 (Ct. Claims 1969), a *per curiam* opinion in which the United States Court of Claims affirmed a referee's report holding that the flooding once every fifteen years of agricultural land used for grazing cattle was not sufficiently frequent to constitute a taking by the government for public use. In establishing the requirement that flooding be frequent in order to constitute a taking, the Court in *Fromme* relied

upon the opinion of the Supreme Court of the United States in *Sanguinetti v. United States*, 264 U.S. 146, 68 L.Ed. 608, 44 S.Ct. 264 (1924).

We do not believe that *Sanguinetti* established a frequency requirement per se in cases involving a governmental taking by intermittent flooding, nor do we find *Fromme* persuasive on this point. It is true that in *Sanguinetti* the Court analyzed its earlier opinion in *Cress* and described it as a case in which "the Government by means of a lock and dam, had raised the water of the Cumberland river above its natural level, so that lands not normally invaded were subjected permanently to frequent overflows, impairing them to the extent of one-half of their value." 264 U.S. at 149, 68 L.Ed. at 610, 44 S.Ct. at 265. It is also true that in *Cress* the Court made reference to the fact that frequent overflows on the plaintiffs' lands had been shown to have occurred. 243 U.S. at 318, 61 L.Ed. at 749, 37 S.Ct. at 381. We do not believe, however, that either *Cress* or *Sanguinetti* was intended to establish a requirement that flooding caused by government structures must be shown to occur with any particular frequency before a taking will have occurred. It remains sufficient to show that the plaintiff's property is subject to permanent liability to intermittent but inevitably recurring overflows.

In both *Sanguinetti* and *Cress*, the Supreme Court seems to have focused its attention on the substantiality of the injury occurring rather than upon the frequency with which flooding occurred as a result of government structures. The frequency of the flooding of the agricultural lands of the plaintiffs in those cases appears to have been one factor which the Supreme Court considered in determining whether substantial injury had been shown. The Supreme Court apparently felt that a showing of infrequent flooding of agricultural land which had always flooded from time to time and which would quickly correct itself after flooding did not amount to a showing that substantial injury had occurred. This being the case, the flooding caused by the government was viewed to be in the nature of a negligent tortious invasion of the property, for which no recovery could be had from the government, rather than a permanent invasion and taking. This view of *Sanguinetti* and *Cress* is borne out by the fact that in other cases, when flooding of agricultural land by government construction began to change the nature of the land and make it

unsuitable for agriculture, the Supreme Court allowed compensation. *E.g., United States v. Williams,* 188 U.S. 485, 47 L.Ed. 554, 23 S.Ct. 363 (1903); *United States v. Lynah,* 188 U.S. 445, 47 L.Ed. 539, 23 S.Ct. 349 (1903).

The defendant also directs our attention to the language of the Supreme Court in *Danforth v. United States,* 308 U.S. 271, 286-87, 84 L.Ed. 240, 247, 60 S.Ct. 231, 237 (1939) indicating that, "retention of water from unusual floods for a somewhat longer period or its increase in depth or destructiveness by reason of the [government structure]" does not amount to a taking. The "unusual" flood involved in *Danforth* happened to have been the highest flood in recorded history on the Mississippi River. The evidence offered to show any specific amount of *increased* flooding as the *foreseeable direct result* of the government structure in that case would have been highly speculative at best. Again, it appears to us that the Supreme Court was focusing its attention upon whether it had been shown that substantial injury had been caused as the foreseeable direct result of the structure built and maintained by the government.

[7] Ordinarily, a mechanical approach should not be taken with regard to the frequency of flooding required to constitute a taking by "[p]ermanent liability to intermittent but inevitably recurring overflows. . . ." *Midgett I,* 260 N.C. at 248, 132 S.E. 2d at 606. The frequency of flooding which will constitute a taking generally will vary with the use to which the property is put. A frequency of flooding sufficient to establish a taking of high density urban residential property, for example, may well fail to be sufficient to establish a taking of low lying grazing lands or other agricultural lands. The issue will hinge to a great extent upon whether the value of the property has been substantially impaired by the additional flooding directly caused by the State's structures. *Midgett I,* 260 N.C. at 248, 132 S.E. 2d at 606-607.

[8] In the present case the evidence tended to show that the structures built and maintained by the defendant caused increased flooding and substantial injury to the plaintiff's relatively high density apartments in an urban area. The highway structures built and maintained by the defendant which were found to have directly caused the increased flooding were permanent in nature. *Midgett I,* 260 N.C. at 248, 132 S.E. 2d at 607. In light of

this evidence, the trial court did not err in concluding that the increased flooding directly resulting from the defendant's structures was a permanent invasion of the plaintiff's property and a taking by the State.

## C.

[9] In order to recover damages in the present case, the plaintiff was also required to make a *prima facie* showing of substantial and measurable damages. *Midgett II*, 265 N.C. at 377-78, 144 S.E. 2d at 125. The defendant contends that the trial court erred in finding that the plaintiff had made the required showing.

The plaintiff introduced extensive evidence of its monetary loss in terms of repair costs, lost present and future rental income and the value of the property before and after the taking by the defendant. Although the evidence of the plaintiff's repair costs and lost present and future rental income were relevant upon the issue of whether there had been a taking and could perhaps be shown to influence what a willing buyer would pay a willing seller for the property, such repair costs and lost income may not be directly recovered as damages in this case. The measure of damages to be used in condemnation cases in which the State does not take the plaintiff's property in its entirety is mandated by G.S. 136-112(1) to be "the difference between the fair market value of the entire tract immediately prior to said taking and the fair market value of the remainder immediately after said taking . . ." less any special or general benefits. The plaintiff offered evidence that the monetary value of the property immediately after the taking was substantially less than it had been immediately before the taking. This constituted the required *prima facie* showing of damage, and the trial court properly adjudged that the plaintiff was entitled to just compensation in an amount to be determined by a jury.

## II.

[10] The defendant also assigns as error the trial court's determination as to the maximum and minimum boundaries of the easement taken. The trial court specifically concluded that:

> 14. Although the return frequency of the upper limit of the estimates of the magnitude of the September 1, 1974 flood at the La Mancha Apàrtments exceeds the maximum

flood for which plaintiffs are entitled to compensation, *i.e.*, the 100 year flood, plaintiff's property is nonetheless still burdened by an easement for the accommodation of flood waters of lower magnitudes, *i.e.*, those waters associated with floods of return frequencies between 26 and 100 years.

The trial court concluded that the plaintiff should receive compensation for injury to its property arising from increased flooding directly caused by the defendant's structures beginning with the level of increased flooding associated with a twenty-six year flood and ending with the level of increased flooding associated with a one hundred year flood. The trial court's conclusions as to both the maximum and minimum boundaries of the easement for flooding taken by the defendant were correct.

Although the evidence tended to show that increased flooding caused by the defendant's structures during the 1 September 1974 flood invaded the plaintiff's real property prior to reaching the level of increased flooding the defendant's structures would have caused during a twenty-six year flood, this increased flooding appears to have passed over open lands which were a part of the plaintiff's property. The evidence did not tend to indicate, however, that such flooding substantially impaired such lands. The trial court correctly concluded that these lands should not be included in defining the easement for flooding taken by the defendant.

Some evidence also tended to show that the increased flooding caused by the defendant's structures during the 1 September 1974 flood may have slightly exceeded that which would have been caused by the structures during a one hundred year flood. The trial court correctly concluded that any portions of the plaintiff's property above the level of increased flooding which would have been caused by the defendant's structures during a one hundred year flood should be excluded in defining the easement for flooding taken.

[11] We have indicated herein that the frequency of flooding is not ordinarily the sole factor in a determination of whether a taking has occurred. Nevertheless, we hold that injury from increased flooding foreseeably and directly resulting from structures built and maintained by the State, but occurring above the level of increased flooding such structures would cause during a

one hundred year flood, may not be included as a part of a taking by the State.

Although floods of a magnitude greater than a one hundred year flood are statistically foreseeable, we hold as a matter of law that evidence concerning damage resulting from increased flooding above the level of increased flooding the State's structures would cause during a one hundred year flood is inherently too speculative and remote in its nature to be relied upon by our courts. *Cf. Danforth v. United States*, 308 U.S. 271, 84 L.Ed. 240, 60 S.Ct. 231 (1939) (highest flood ever recorded on the Mississippi River). Therefore, the trial court correctly excluded such evidence from its consideration in reaching its judgment in the present case.

It will no doubt at times be the case that all available evidence will be too speculative or remote to show that increased injury occurring at or below the level associated with a one hundred year flood was in fact the foreseeable direct result of structures built by the State. In each case it will be the responsibility of the trial court to make an initial determination as to whether the evidence introduced is sufficiently substantial and bears sufficient indicia of reliability to support a finding that such increased injury was the foreseeable direct result of the State's structures. If the trial court determines that the evidence introduced is substantial and bears the necessary indicia of reliability, it will then be the duty of the trier of fact—judge or jury—to determine whether the injury occurring was in fact the foreseeable direct result of the State's structures.

Given the particular evidence introduced in this case, we do not think that the trial court erred in determining that the evidence before it concerning increased flooding directly caused by the defendant's structures, during flooding at and below the level which these structures would have caused during a one hundred year flood, was substantial and bore sufficient indicia of reliability to support a finding of a taking. Dr. Parker, the expert in hydrology who testified for the plaintiff, had available to him the actual maximum recorded flows in the stream in question over a period of years as measured and recorded by official United States Geological Survey water gauges maintained on the stream over a period of years. He also had available meas-

urements of the actual flooding which occurred on the plaintiff's property on 1 September 1974 which had been recorded by an agent of the defendant. Using these actual measurements, he applied well recognized mathematical principles and generally accepted scientific techniques to determine with precision the amount of increased flooding which would be caused on the plaintiff's property by the defendant's structures during floods of any given magnitude. All of this evidence was properly admitted by the trial court.

Given such evidence, the trial court was justified in its determination that the evidence before it was substantial and bore sufficient indicia of reliability to support a determination that there had been a taking. Based upon this evidence, the trial court made appropriate findings and correctly concluded that the maximum boundary of the easement for flooding taken by the defendant was the level of increased flooding directly resulting from the defendant's structures during a one hundred year flood.

III.

[12] The defendant also contends that this action for inverse condemnation is based upon a theory of a taking by nuisance and that it should be barred by the doctrine of "moving to the nuisance." It is true that an inverse condemnation action for a taking by flooding is based upon a nuisance theory. *Midgett I,* 260 N.C. at 248, 132 S.E. 2d at 606. In an action among private parties the question of "moving to the nuisance" or "priority of occupation" is relevant but not conclusive as to the existence of a nuisance. *Watts v. Manufacturing Co.,* 256 N.C. 611, 619, 124 S.E. 2d 809, 815 (1962). Priority of occupation in such cases is to be considered with all the evidence in determining whether the party alleged to be engaged in maintaining a nuisance is engaged in a reasonable use of his property. The "reasonable use" rule is not applicable, however, in an action against the government for a taking. *Board of Transportation v. Warehouse Corp.,* 300 N.C. 700, 268 S.E. 2d 180 (1980). Therefore, the doctrine of "moving to the nuisance" or "priority of occupation" has no applicability in an action against the State for a taking by flooding directly caused by permanent structures constructed by the State.

The defendant argues that a refusal to apply the doctrine of "moving to the nuisance" or "priority of occupation" in the pres-

ent case will subject it to liability for unlimited future damages because the plaintiff may now construct new apartments in the area in question and then recover damages against the defendant if the defendant's structures later cause those apartments to flood. Again, we believe that this argument fails to draw a proper distinction between an action in tort against a private party for the maintenance of a nuisance and an action in inverse condemnation against the State for the permanent taking of property.

Here, the State has been found to have taken a defined portion of the plaintiff's land as a permanent easement for flooding and will be required to compensate fully for this permanent taking. Having taken and paid for a permanent easement for flooding in a defined portion of the plaintiff's property, the State now has the right to the permanent use of the easement taken without incurring further liability to the plaintiff or its successors in title. *See Midgett I,* 260 N.C. at 249, 132 S.E. 2d at 607; *Bruton v. Light Co.,* 217 N.C. 1, 6 S.E. 2d 822 (1940); *Staton v. R.R.,* 147 N.C. 428, 442-43, 61 S.E. 455, 460 (1908). Thus, the defendant's fears in this regard are unfounded, and this contention is without merit.

## IV.

The defendant further assigns as error the admission by the trial court of certain evidence as well as findings and conclusions by the trial court which the defendant contends were based upon such erroneously admitted evidence. In a trial before the court without a jury, there is a rebuttable presumption that the trial court disregarded any incompetent evidence which may have been admitted. *Bizzell v. Bizzell,* 247 N.C. 590, 101 S.E. 2d 668, *cert. denied,* 358 U.S. 888, 3 L.Ed. 2d 115, 79 S.Ct. 129 (1958). Further, the trial court's findings of fact which are supported by competent evidence are conclusive on appeal even though the evidence also might sustain findings to the contrary. *Williams v. Insurance Co.,* 288 N.C. 338, 342, 218 S.E. 2d 368, 371 (1975). If, however, it appears that the trial court was influenced to the prejudice of a party by the incompetent evidence, the presumption disappears and error is shown. *Reid v. Johnston,* 241 N.C. 201, 85 S.E. 2d 114 (1954).

Lea Co. v. N. C. Board of Transportation

[13] The defendant contends that evidence which was introduced tending to show flooding of the plaintiff's property on four occasions subsequent to the flood on 1 September 1974 was irrelevant and prejudicial. In its amended complaint, the plaintiff alleged that the appropriation of an easement in its property occurred as a result of increased flooding caused by the defendant's structures during the 1 September 1974 flood and during the subsequent floods. Although only one taking of an easement for flooding in the plaintiff's property occurred, the plaintiff was entitled to allege that the taking of its property occurred on alternative dates and arose from alternative events. The evidence relating to flooding of plaintiff's property after 1 September 1974 was relevant to the alternative dates and alternative flooding alleged in the complaint and was admissible. Such evidence was not, however, competent with regard to the issue of whether a taking had occurred as the result of the flood of 1 September 1974. *Midgett II,* 265 N.C. at 377, 144 S.E. 2d at 124.

It is clear, however, that the trial court was not influenced by the evidence concerning flooding subsequent to 1 September 1974. The trial court made appropriate findings and specifically concluded that an easement for flooding was taken in the plaintiff's property during the 1 September 1974 flood. The trial court made no findings or conclusions indicating that the flooding subsequent to 1 September 1974 was considered by it to comprise any part of the taking of the easement for flooding in the defendant's property. Instead, the findings, conclusion and judgment of the trial court clearly indicate that the trial court relied upon scientifically approved statistical data based upon actual measurements of high water levels occurring at the site in question during the 1 September 1974 flood in determining that the increased flooding caused by the defendant's structures comprised a taking. The evidence which the trial court clearly relied upon was competent and relevant for such purposes. Therefore, the defendant failed to rebut the presumption that the trial court disregarded any incompetent evidence in deciding this issue.

[14] The defendant also contends that the trial court erred in admitting the evidence of calculations of flood levels by the plaintiff's experts. The defendant contends these calculations were based on the false assumption that conditions had remained unchanged at the site since the time of the 1 September 1974

flood. The defendant argues that conditions were indisputably different at the site after the flood because construction at the site was not completed until after the flood. This argument is in part correct but not determinative. It ignores the fact that many of the calculations made by the plaintiff's experts were based upon measurements of actual high water levels during the 1 September 1974 flood which were made and recorded by a witness for the defendant.

Further, there is evidence in the record of substantial similarities existing at the time of the 1 September 1974 flood and all later periods. Although construction of an extension of the Ramp B culvert was not completed on 1 September 1974, for example, the opening in Ramp B which was to contain the extension of that culvert had been completed and presumably would have allowed an amount of water at least equal to that which the completed culvert would have carried to pass through the raised bed of the road.

The defendant presented no specific evidence and makes no specific argument as to how conditions at the site on 1 September 1974 differed in any material way from conditions there after construction was completed. Whether the calculations of the expert witnesses were made under sufficiently similar conditions to be admissible was within the discretion of the trial court. *See Mintz v. R.R.*, 236 N.C. 109, 115, 72 S.E. 2d 38, 43 (1952). We find no basis in the record before us to support a holding that the trial court abused its discretion by the admission of the calculations of the experts introduced in evidence in this case.

The defendant also presents numerous additional assignments of error relative to the trial court's actions in allowing into evidence testimony and computations concerning the depths and rates of the flow of water near the defendant's construction site which would have been experienced under varying conditions or which were alleged to have been experienced on 1 September 1974. Without reviewing each of the defendant's as-signments and contentions in detail, it is sufficient for us to observe that the thrust of these assignments and contentions by the defendant seems to involve a challenge to the credibility of the testimony and computations and not to their competency or admissibility. The admission into evidence of the testimony and computations challenged by the defendant was not error.

## V.

[15]   The defendant also assigns as error the trial court's exclusion of certain evidence the defendant sought to introduce through an expert witness. The defendant sought to show through the testimony of Bernard Ingram that the structures complained of would have a negligible effect on flooding during a one hundred year flood. The defendant sought to have Ingram state his opinion on this and related matters. Prior to an opinion being given by the witness, however, it became clear that his opinion was based, at least in part, upon the results of computations from a computer "run" by the United States Army Corps of Engineers. Some of the documents produced during this computer "run" and other data the witness apparently used in arriving at his conclusions were not presented at trial.

Assuming that this expert witness would have testified concerning his personal calculations and computations, it was within the discretion of the trial court to require him first to relate the underlying facts he used in making the calculations and computations upon which he based his opinion before giving his opinion. *Board of Transportation v. Warehouse Corp.*, 300 N.C. 700, 708, 268 S.E. 2d 180, 185 (1980). Here, there is no indication that the trial court abused its discretion by requiring the witness to state the underlying facts before giving his opinion[2] or in excluding his opinion when he was unable to present the documentation which comprised the facts underlying his opinion.

## VI.

The plaintiff additionally assigns as error the action of the trial court in allowing the plaintiff's motion to amend its pleadings, which motion was filed after all of the evidence in the present case had been introduced. The defendant contends that allowing the plaintiff's motion to amend permitted the trial court to consider and rely upon irrelevant evidence having no bearing on whether there was a taking on 1 September 1974. We do not agree.

The defendant contends that the amendment to the plaintiff's pleadings permitted the court to rely upon evidence of flooding on

---

2. *But cf.* G.S. 8-58.14 for rules applicable to trials on and after 1 October 1981.

occasions after 1 September 1974 in determining whether a taking had occurred, and that reliance upon such evidence was improper. We need not determine, however, whether the trial court's act in permitting the pleadings to be amended to allege the later flooding of the plaintiff's property or the introduction of evidence concerning such later flooding was erroneous. The findings and conclusions set forth in the trial court's judgment make it absolutely clear that the trial court did not in any way rely upon evidence of flooding occurring after 1 September 1974 in reaching its judgment.

The defendant also contends that the amendment to the plaintiff's pleadings permitted the trial court to improperly consider events such as water levels and discharges during a one hundred year flood. Evidence of such matters was offered as proof of the claim for relief for a taking on 1 September 1974 which had already been pled in the complaint. It was not necessary that such matters going to prove the claim for relief already alleged in the complaint be included as a part of the complaint. A party is not required to plead evidence. G.S. 1A-1, Rule 8; *Fox v. Southern Appliances*, 264 N.C. 267, 141 S.E. 2d 522 (1965). The amendment to the pleadings caused no harm to the defendant.

## VII.

[16] The defendant pled as a defense the statute of limitations. It now assigns error to the trial court's conclusion that the plaintiff's claim for relief arose on 1 September 1974 and that commencement of this action on 30 May 1975 was within the applicable statute of limitations. This assignment is without merit.

The statute of limitations having been pled, the burden was on the plaintiff to show that its claim for relief accrued within the time prescribed. *Hooper v. Lumber Co.*, 215 N.C. 308, 1 S.E. 2d 818 (1939). As we have previously pointed out, the plaintiff's claim for relief for inverse condemnation did not arise until injury had been inflicted to its property by excess flooding directly resulting from the defendant's structures. *Midgett I,* 260 N.C. at 249, 132 S.E. 2d at 607; *Midgett II,* 265 N.C. at 377, 144 S.E. 2d at 124. The defendant contends that its uncontested evidence tended to show that substantial flooding occurred on the plaintiff's property during the 1940's and 1950's and that the plaintiff's claim for relief, if any, arose during one of those periods. We do not agree.

The defendant introduced evidence through a witness who was a paper boy in the area during the 1940's tending to show that flooding occurred on the plaintiff's property as a result of the overflow of South Buffalo Creek at various times during that decade. The witness was a child during those years, and his testimony related the flooding during that period to homes and other structures which were in place at the time. During the decade of the 1940's, High Point Road had been built and was maintained by the defendant, but none of the construction associated with the interchange had been constructed. The defendant also introduced testimony of a witness indicating that flooding occurred in the area of the plaintiff's property during the 1950's, at a time when Ramp B and the original culvert at Y-3 had been constructed.

The plaintiff introduced expert testimony tending to show that the flooding on its property on 1 September 1974 occurred as a direct result of the effect upon the creek of the *combination* of Ramp B, Y-3, and Ramp A. This *combination* of the defendant's structures was not in existence until 1974. No evidence was introduced tending to show any flooding by this *combination* of structures prior to 1 September 1974.

Here, the trial court acted in the dual capacity of judge and jury. Having weighed the evidence introduced by the parties and the conflicting inferences which could be drawn therefrom, the trial court was free to disbelieve the defendant's evidence and to believe the plaintiff's. Having weighed the evidence of the parties and the conflicting inferences, the trial court determined that the injury to the plaintiff's property was the direct result of the *combination* of the defendant's structures in place on 1 September 1974. By this determination, the trial court rejected all opposing evidence and inferences to be drawn therefrom including inferences that the flooding on 1 September 1974 would have occurred in the absence of Ramp A which was completed in 1974. *See Williams v. Insurance Co.*, 288 N.C. 338, 343, 218 S.E. 2d 368, 372 (1975). The trial court's findings and conclusions resolved the ultimate issues presented and are binding upon us, since the evidence supports the findings which in turn support the trial court's conclusions and judgment. *Id.*

The trial court having properly determined that the plaintiff's property first suffered injury as a direct result of the

Lea Co. v. N. C. Board of Transportation

defendant's structures on 1 September 1974, the plaintiff's claim for relief first arose on that date. The filing of the plaintiff's complaint on 30 May 1975 was within the time prescribed by G.S. 136-111.

## VIII.

[17] The defendant, BOT, assigns as error the trial court's failure to sustain its plea in bar based upon the consent judgment entered in the prior condemnation action brought by BOT against Lea Company in which BOT took a small portion on the southern boundary of Lea Company's property. The defendant contends that the language of the consent judgment, and particularly the portions thereof reciting that the consent judgment includes "any and all damages" caused by the construction of the interchange modifications involved here, cuts off any recovery of compensation for flooding caused by the defendant's construction. The defendant contends also that, under the rule of damages prescribed by G.S. 136-112(1), the compensation for flooding which Lea Company seeks to recover in this action was recoverable as a matter of law in the prior action only. We find the defendant's assignment and contentions in this regard to be without merit.

After hearing arguments of counsel for the parties, the trial court ruled as follows:

> The language in the consent judgment "for any and all damages caused by the construction of that project" cannot be construed to preclude a claim by plaintiffs [sic] arising from construction other than on or directly affecting the plaintiffs' [sic] property which was taken or which lies directly adjacent to the property taken whatever the project numbers may have been recited, the language relied on by defendant cannot be construed to have covered within the necessary contemplation of the parties to the consent judgment, damages arising from construction away from plaintiff's property. This Motion in bar is denied.

The defendant contended at trial and argues on appeal that the taking of the easement for flooding on 1 September 1974 constitutes "part of the damages caused by the construction of said project" contemplated by the parties at the time the consent judgment was signed by them. The language of the consent judgment relied upon by the defendant is as follows:

The sum of Three Thousand Five Hundred Dollars ($3,500) is the full, fair and adequate value of just compensation for the taking of the hereinabove described interest and area by the Board of Transportation and for any and all damages caused by the construction of said project.

The "hereinabove described interest and area" referred to in the consent judgment does not include any specific reference to the interest or area comprising the easement taken here for flooding. Further, the stipulated facts before us on appeal clearly indicate that counsel for both BOT and Lea Company had signed the consent judgment by 25 April 1974. All parties to the prior action, including those who were arguably not essential parties, had signed the consent judgment by 27 August 1974. Without belaboring the point further, it suffices to say that the evidence before the trial court supported its determination that neither the interest nor the area involved in the 1 September 1974 taking by flooding were within the contemplation of the parties when they agreed to and signed the consent judgment.

[18]   We next reach the defendant's contention that under the rule of damages prescribed in G.S. 136-112(1) the injury by flooding resulting in the taking of property for which Lea Company seeks compensation in this action was as a matter of law damages recoverable only in the prior action. We have recently held that, "when the Department of Transportation takes only a part of a tract of land, the owners may introduce at the jury trial on the issue of compensation any evidence of damage to the remaining property caused by the Department of Transportation before the opening of the jury trial." *Department of Transportation v. Bragg,* 308 N.C. 367, 371, 302 S.E. 2d 227, 230 (1983). *See also, e.g., Board of Transportation v. Warehouse Corp.,* 300 N.C. 700, 268 S.E. 2d 180 (1980). We explained this holding in part by pointing out that, when trial on the issue of damages in the initial condemnation action has not yet occurred, "principles of judicial economy dictate that the owners of the taken land may allege a further taking by inverse condemnation in the ongoing proceedings." *Department of Transportation v. Bragg,* at 371 n. 1, 302 S.E. 2d at 230 n. 1.

Nothing in our opinion in *Bragg,* the statutes or our previous opinions, however, mandates that property owners must seek to

recover compensation in the ongoing condemnation proceedings for a subsequent further taking by the State. Property owners may choose to bring a separate action for inverse condemnation pursuant to G.S. 136-111 when there is a further taking by the State after the initiation of the original condemnation action. When choosing to bring a separate action for inverse condemnation, however, it should be borne in mind that the property owners will not be entitled to damages which are merely a consequence of the taking in the prior condemnation action. Injuries accruing to the remaining property caused by the original taking by condemnation, including injuries resulting from the condemnor's use of the previously taken portion, are not compensable in an inverse condemnation action unless they are so great as to amount in themselves to a separate taking.

Even if we adopted the view that *Bragg* requires a property owner to seek to recover damages for an inverse condemnation of his property in a prior ongoing action for a partial taking initiated by the State under G.S. 136-103 — a view which we specifically reject — the defendant could not prevail here. In the present case, the prior action for a partial taking of Lea Company's property was not "ongoing" at the time of the taking of the easement for flooding by inverse condemnation. No issues concerning compensation remained to be decided in that prior action after the parties signed the consent judgment. All parties signed the consent judgment prior to the first flooding of the plaintiff's property on 1 September 1974. The plaintiff had no claim for relief for inverse condemnation of an easement for flooding until its property was actually invaded by water on 1 September 1974. *Midgett I,* 260 N.C. at 249, 132 S.E. 2d at 607; *Midgett II,* 265 N.C. at 377, 144 S.E. 2d at 124. Therefore, the defendant had no injury to allege as a further taking by inverse condemnation at any time during which the prior condemnation proceeding was *ongoing* within the meaning of *Bragg.*

For the foregoing reasons we reject the defendant's contention that compensation for the inverse condemnation of an easement for flooding, which the plaintiff seeks to recover in this action, was recoverable in the prior condemnation action or not at all. The trial court did not err in denying the defendant's plea in bar based upon the prior consent judgment.

For the reasons set forth herein, the decision of the Court of Appeals affirming the judgment of the Superior Court is

Affirmed.

Justice FRYE did not participate in the consideration or decision of this case.