THOMAS R. PEACH AND WIFE, SUSAN M. PEACH, PLAINTIFFS v. CITY OF HIGH POINT
AND BREECE ENTERPRISES, INC., DEFENDANTS

No. COA08-1174

(Filed 1 September 2009)

**1. Eminent Domain— inverse condemnation—replacement of sewer outfall—not solely a negligence claim**

Homeowners asserting damage from the replacement of a sewer outfall were not limited to bringing a negligence claim and were allowed to bring an inverse condemnation claim. Plaintiffs asserted that the damages to their property were generalized, not repairable, and resulted in loss of value to their property.

**2. Statutes of Limitation and Repose— inverse condemnation—replacement of sewer outfall—time of taking—opportunity to discover damage**

The trial court erred by granting summary judgment based on the statute of limitations in an action alleging inverse condemnation where sewage backed up into the house and the yard after replacement of a sewer outfall and there were genuine issues of material fact as to when the taking occurred. Although defendant contended that the taking occurred when the old easement was acquired and the outfall installed on plaintiffs' property, there were issues as to when plaintiffs had an adequate opportunity to discover the damage to their property and whether the action was timely filed under N.C.G.S. § 40A-51(a).

**3. Statutes of Limitation and Repose— inverse condemnation—replacement of sewer outfall—time of taking—completion of project**

Summary judgment based on the statute of limitations should not have been granted in an inverse condemnation action that arose from the replacement of a sewer outfall where there was a genuine issue of material fact as to when the project was completed. The forecast of evidence tends to show that the construction company (with whom plaintiffs settled) had returned to plaintiffs' residence to perform work which it had originally agreed to do but neglected to complete.

Appeal by plaintiffs from order entered 1 November 2007 by Judge Catherine C. Eagles in Guilford County Superior Court. Heard in the Court of Appeals 11 March 2009.

*Sparrow Wolf & Dennis, P.A., by James A. Gregorio and Donald G. Sparrow, for plaintiff-appellants.*

*Smith Moore Leatherwood LLP, by James G. Exum, Jr., Bruce P. Ashley, and Travis W. Martin, for defendant-appellee The City of High Point.*

HUNTER, Robert C., Judge.

On 1 November 2007, Judge Catherine C. Eagles entered an order, which, *inter alia*, granted summary judgment in favor of the City of High Point (the "City" or "defendant") and dismissed Thomas R. and Susan M. Peach's ("plaintiffs") inverse condemnation claim with prejudice based on the running of the statute of limitations. On 3 March 2008, plaintiffs' appeal was dismissed by the trial court due to their counsel's failure to file their notice of appeal in accordance with N.C.R. App. P. 3. On 21 May 2008, plaintiffs petitioned this Court for writ of certiorari to review the 1 November 2007 order. On 30 May 2008, this Court allowed said petition, but stated: "Review shall be limited to whether plaintiffs's [sic] claim against the City of High Point for inverse condemnation is barred by the applicable statue [sic] of limitations." Accordingly, this is the sole issue before us on appeal. After careful review, we reverse and remand.

I. Standard of Review

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." A defendant who moves for summary judgment assumes the burden of positively and clearly showing that there is no genuine issue as to any material fact and that he or she is entitled to judgment as a matter of law.

*James v. Clark*, 118 N.C. App. 178, 180, 454 S.E.2d 826, 828 (1995) (quoting N.C. Gen. Stat. § 1A-1, Rule 56(c)(1990)), *disc. review denied*, 340 N.C. 359, 458 S.E.2d 187 (1985). "A defendant may meet this burden by (1) proving that an essential element of the plaintiff's claim is nonexistent, or (2) showing through discovery that plaintiff cannot produce evidence to support an essential element of his or her claim, or (3) showing that plaintiff cannot surmount an affirmative defense which would bar the claim." *Watts v. Cumberland County Hosp. System*, 75 N.C. App. 1, 6, 330 S.E.2d 242, 247 (1985), *reversed*

*on other grounds,* 317 N.C. 321, 345 S.E.2d 201 (1986). "In passing upon a motion for summary judgment, all materials filed in support or opposition to the motion must be viewed in the light most favorable to the party opposing the summary judgment and that party is entitled to the benefit of all inferences in his favor which may be reasonably drawn from that material." *James,* 118 N.C. App. at 181, 454 S.E.2d at 828. "Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway,* 139 N.C. App. 778, 784-85, 534 S.E.2d 660, 664 (2000). Our standard of review is de novo. *Forbis v. Neal,* 361 N.C. 519, 524, 649 S.E.2d 382, 385 (2007).

## II. Factual Background

When viewed in the light most favorable to plaintiffs, the forecast of evidence in the record tends to show the following facts and circumstances. Since 1983, plaintiffs have owned a residence located at 1633 North Hamilton Street in High Point, which is served by defendant's sewage system. In the 1990s, defendant decided to upgrade its sewage system, and in August 1999, Breece Enterprises, Inc. ("Breece")[1] was the successful bidder for defendant's upgrade project, titled " 'Water and Sewer Improvements 1999' " (the "Overall Project"). Prior to beginning the Overall Project, defendant provided Breece with "sealed engineering plans" from defendant's Central Engineering Department, which subdivided the Overall Project into geographical regions. The portion of the Overall Project that implicated plaintiffs' property was referred to as the "Dayton Street Outfall Project" (the "DSO Project").

The DSO Project primarily involved the replacement of the old outfall line (the "old outfall"), which was located in plaintiffs' neighborhood, with a new outfall line (the "new outfall"). Outfall lines are sewer lines that carry wastewater and sewage from main sewer lines to wastewater treatment facilities. Defendant's residential sewage system typically works as follows: (1) a residence is connected to a main sewer line, which is located in the street in front of the residence and is the exit point for the residence's wastewater; and (2) the main sewer line is connected to an outfall line, which carries the wastewater to a treatment facility. At some point in 1999, defendant

---

1. Breece was originally a defendant in this case; however, on 22 October 2007, plaintiffs and Breece entered into an agreement for "settlement and mutual release."

approached plaintiffs and told them that: their residence was located above part of the old outfall in an easement (the "old easement"); the City planned on replacing the old outfall with the new outfall; and the City could condemn their property unless the City was permitted to run the new outfall through plaintiffs' yard. It is undisputed that this is the first time that plaintiffs learned about the presence of the old outfall and the old easement. On 23 May 2000, plaintiffs granted defendant the new easement, which was described as a permanent and temporary construction easement "to construct, repair, maintain, inspect, operate, replace, enlarge and protect the sewer lines and pipes, and for any other purpose useful or necessary for the proper and adequate functioning of the [City's] sewer system," in exchange for $1,000.00.

Plaintiffs' home was built sometime in the late 1920s. The parties agree that the old outfall was placed on plaintiffs' property prior to the home's construction. At some point, plaintiffs' residence was directly connected to the old outfall, which functioned as a main line, i.e., served as the exit point for the wastewater that exited their home. Plaintiffs assert that defendant installed the old outfall and connected their residence to it, a fact which defendant disputes, and at the summary judgment hearing, plaintiffs' counsel conceded that plaintiffs had no evidence as to who installed the old outfall or connected plaintiffs' home to it. However, it is undisputed that neither the presence of the old outfall nor the old easement were platted or recorded and that defendant had been using the old outfall as part of its sewer system for decades until late 2000 or early 2001. In the 1940s or 1950s, defendant installed a main sewer line (the "main line") down North Hamilton Street. The main line has a connection for plaintiffs' house; however, when the main line was installed, plaintiffs' residence was not connected to it and remained connected to the old outfall. Plaintiffs contend that when defendant installed the main line, it decided to leave plaintiffs' home connected to the old outfall and neglected to make note of this fact. Defendant claims that the City had no knowledge that plaintiffs' home was directly connected to the old outfall until early May 2002.

Defendant's plans for the DSO Project, which are dated 4 March 1999, indicate that Breece was to remove the majority of the old outfall and replace it with the new outfall; however, a portion of the old outfall, including approximately 30 feet running beneath plaintiffs' property, was to be abandoned, filled with flowable fill concrete, and capped. In addition, defendant planned to abandon the old easement.

According to Leon Adams ("Mr. Adams"), who was employed with the City's Engineering Services Department at the time the DSO Project was undertaken, the old outfall was abandoned in December 2000 or January 2001, with the new outfall being connected to the City's sewer system in its place. Counsel for Breece admitted that Breece did not fill the abandoned portion of the old outfall with flowable fill and cap it at the time the old outfall was abandoned.

Approximately one month after the new outfall was installed, a pervasive, noxious odor began to emanate from plaintiffs' yard and through their basement, and plaintiffs telephoned defendant's call center to complain about said odor and about their drains backing up. In late April or early May of 2002, plaintiffs learned that their residence was connected to the old outfall instead of the main line. In May 2002, at the City's direction, Breece connected plaintiffs' home to the new outfall and filled and capped the old outfall.

By this time, however, wastewater had been exiting from plaintiffs' home and from at least one other residence into the old outfall for approximately 18 months, and because the old outfall was no longer tied into defendant's sewage system, fecal matter, bacteria, mold, ammonia, nitrogen, and other waste had been emanating from the old line, which saturated and contaminated the soil in plaintiffs' yard and overflowed into plaintiffs' basement and a storm-water runoff creek behind their home. At some point thereafter, plaintiffs' home was appraised as being worth $0.00.

Additional facts necessary to an understanding of this case are set out in the opinion below.

### III. Statute of Limitation

Whether a cause of action is barred by a statute of limitation is a mixed question of law and fact, and where the facts are admitted or established, the trial court may sustain the plea to dismiss as a matter of law. Where, however, the evidence is sufficient to support an inference that the cause of action is not barred, the issue is for the jury.

*Little v. Rose*, 285 N.C. 724, 727, 208 S.E.2d 666, 668 (1974) (citations omitted). In determining whether a cause of action is barred by the statute of limitations, courts must determine the applicable limitations period and the date of accrual of that action. *See, e.g., James*, 118 N.C. App. at 183, 454 S.E.2d at 829. The applicable statute of limitations for an inverse condemnation action is contained in N.C. Gen.

Stat. § 40A-51 (2007), which provides in pertinent part that, such an "action may be initiated within 24 months of the date of the taking of the affected property or the completion of the project involving the taking, *whichever shall occur later*." N.C. Gen. Stat. § 40A-51(a) (emphasis added). "[P]laintiffs have the burden of showing their actions were filed within the statutory period." *McAdoo v. City of Greensboro*, 91 N.C. App. 570, 572, 372 S.E.2d 742, 743 (1988).

Here, the parties agree that in order for plaintiffs' inverse condemnation claim to be timely, the evidentiary forecast must tend to show that said claim began to accrue on or subsequent to 9 December 2001, as plaintiffs filed their initial complaint on 9 December 2003. Plaintiffs assert that the evidentiary forecast before the trial court demonstrated that genuine issues of material fact exist as to: (1) when the "taking" occurred; and (2) when the "project involving the taking," i.e., the DSO Project, was completed. N.C. Gen. § 40A-51(a). Defendant contends that plaintiffs' claim is really a negligence claim based on the overflow of plaintiffs' sewage into the old outfall and that plaintiffs can only recover in negligence.[2] Defendant further contends that even if plaintiffs' claim is an inverse condemnation claim, said claim conclusively began accruing prior to 9 December 2001 and is barred by the statute of limitations as a matter of law. As discussed *infra*, we agree with plaintiffs.

### A. Negligence or Inverse Condemnation Claim

[1] In support of defendant's argument that plaintiffs' claim is essentially a negligence claim and that plaintiffs were exclusively limited to bringing a claim for negligence, defendant cites this Court's decision in *Ward v. City of Charlotte*, 48 N.C. App. 463, 469, 269 S.E.2d 663, 667, *disc. review denied*, 301 N.C. 531, 273 S.E.2d 463 (1980), where this Court held, "that the sole basis of municipal liability for damages caused by the overflow of a sewerage system is negligence[.]" As discussed *infra*, we do not believe that *Ward* limits plaintiffs' claim to negligence and conclude that plaintiffs' claim can be properly classified and brought as an inverse condemnation claim.

In *Ward*, the plaintiffs filed claims for: (1) negligence, based on the City of Charlotte's (the "City") purported "failure [to] properly . . . inspect, maintain, repair and keep unobstructed the sewer line serving [the plaintiffs'] home"; (2) breach of a continuing contract under which the City agreed to carry sewage away from the

---

2. Plaintiffs also brought a negligence claim against defendants. The trial court dismissed this claim with prejudice as well; this claim is not before us on appeal.

plaintiffs' home in exchange for monthly payments; (3) breach of an implied warranty that the City's sewage system was fit for its intended purpose; and (4) trespass on the case. *Id.* 464-65, 269 S.E.2d at 664. In rejecting the latter three causes of action and adopting "the prevailing rule that the sole basis of municipal liability for damages caused by the overflow of a sewerage system is negligence," this Court emphasized that "[t]he application of any one of [these actions] to [the specific case before the Court] would effectively make a municipality an absolute insurer of the condition of its sewerage system[, which the Court] decline[d] to do." *Id.* at 469, 269 S.E.2d at 667. In other words, this Court was concerned about the larger ramifications of affording the plaintiffs a right to relief based on contract or additional tort principles. The plaintiffs in *Ward* did not bring an inverse condemnation claim and that case was decided prior to the enactment of N.C. Gen. Stat. § 40A-51, which provides a statutory "inverse condemnation remedy." *City of Winston-Salem v. Ferrell*, 79 N.C. App. 103, 108, 338 S.E.2d 794, 798 (1986). As such, whether a plaintiff can recover for inverse condemnation based on an overall, general loss of property value was not before this Court in *Ward*; rather, the damages that the plaintiffs sought were for particularized and repairable damages to their home, purportedly caused by a backup in the sewer line that served their home. *Ward*, 48 N.C. App. at 464-65, 269 S.E.2d at 664.

This Court has stated that: "Inverse condemnation is simply a device to force a governmental body to exercise its power of condemnation, even though it may have no desire to do so." *Smith v. City of Charlotte*, 79 N.C. App. 517, 521, 339 S.E.2d 844, 847 (1986).

An action in inverse condemnation must show (1) a taking (2) of private property (3) for a public use or purpose. Although an actual occupation of the land, dispossession of the landowner, or physical touching of the land is not necessary, a taking of private property requires "a substantial interference with elemental rights growing out of the ownership of the property." A plaintiff must show an actual interference with or disturbance of property rights resulting in injuries which are not merely consequential or incidental.

*Adams Outdoor Advertising v. N.C. Dept. of Transportation*, 112 N.C. App. 120, 122, 434 S.E.2d 666, 667 (1993) (internal citations omitted) (quoting *Long v. City of Charlotte*, 306 N.C. 187, 198-99, 293 S.E.2d 101, 109 (1982)).

In contrast to the plaintiffs in *Ward*, here, plaintiffs assert that the damages to their property are generalized and not repairable, i.e., that a reduction in the market value of their property occurred. Essentially, plaintiffs contend that when defendant updated its sewage system on North Hamilton Street, eliminated the old outfall from said system, and failed to fill and cap the old outfall for approximately 18 months, defendant created a situation in which the continuous flow of wastewater from plaintiffs' residence and from their neighbors' residence: (1) entered into the old outfall; (2) both exited the uncapped ends of and seeped through cracks in the old outfall onto their property; and (3) turned their property into a waste lagoon, rendering it worthless. Plaintiffs assert that this constituted substantial interference with their property rights and resulted in injuries that were not consequential or merely incidental.[3] We agree.

Because an inverse condemnation claim was not before this Court in *Ward*, that case was decided prior to the enactment of N.C. Gen. Stat. § 40A-51, and plaintiffs' claim is for generalized loss of value of their property, we do not believe that *Ward* limits plaintiffs to a cause of action for negligence. *See Howell v. City of Lumberton*, 144 N.C. App. 695, 701-02, 548 S.E.2d 835, 839 (2001) (holding that where a plaintiff "is not seeking to recover for the general loss of value to her property due to the 'continual and ongoing effects of the location of [a storm drain] pipe' " located in an easement on her property, but rather for "specific damage to her house," a "plaintiff has legitimately characterized her claim as an action in negligence" and "N.C. Gen. Stat. § 40A-51[, the inverse condemnation statute,] does not preempt that negligence action."). Also, in accordance with the law of inverse condemnation cited above, we believe that plaintiffs' claim can be properly classified as one for inverse condemnation, and that the earliest point at which it can be fairly argued that a "taking" occurred here, is when defendant eliminated the old outfall from its sewage system, which allowed for the process via which plaintiffs' property was substantially damaged to occur.

### B  "Taking"

[2] Plaintiffs contend genuine issues of material fact exist as to when the "taking" occurred here, and consequently, that the trial court

---

3. In addition, we note that plaintiffs assert that even after Breece returned to fill and cap the old outfall and to properly connect their residence to plaintiff's sewage system in May 2002, waste has continued to accumulate on their property because the old outfall has not been adequately filled and their residence was not properly connected to defendant's sewage system due to a dip in the line.

erred in granting summary judgment in defendant's favor based on the statute of limitations. Defendant asserts that no genuine issue of material fact exists, that any taking conclusively occurred prior to 9 December 2001, and that plaintiffs' inverse condemnation claim is barred by the statute of limitations as a mater of law. As discussed *infra*, we agree with plaintiffs.

Defendant contends that if there was a taking here, it occurred when the old easement was acquired and the old outfall was installed on plaintiffs' property, which was prior to 1926. In support, defendant cites *Central Carolina Developers, Inc. v. Moore Water & Sewer Auth.*, 148 N.C. App. 564, 559 S.E.2d 230 (2002). Plaintiffs argue that that case is distinguishable and does not establish that the "taking" here conclusively occurred when the old outfall was installed and the old easement was acquired. We agree.

In *Central Carolina Developers*, the plaintiffs asserted that the mere presence of a sewer pipe, which ran across their lot, was the taking, and the damages that the plaintiff asserted, i.e., being barred from building a residence, were strictly due to the presence of said pipe. *Id.* at 565, 559 S.E.2d at 231. Here, plaintiffs do not allege that the presence of the old outfall was the taking. Rather, they contend that by eliminating the old outfall from its sewage system, defendant created a condition in which wastewater repeatedly exited plaintiffs' home and their neighbors' home and collected on plaintiffs' property, and that the damage from this process is what constitutes the taking. Consequently, we do not think that *Central Carolina Developers* controls the outcome here.

Next, in *Frances L. Austin Family Ltd. P'ship v. City of High Point*, 177 N.C. App. 753, 630 S.E.2d 37 (2006), a case which neither party cites, the plaintiffs argued that the defendant's "act of leaving [the defendant's] buried sewer pipe on [the defendant's] abandoned sewer easement" constituted a compensable taking. *Id.* at 755, 630 S.E.2d at 39. This Court disagreed. Because: (1) the defendant had paid the plaintiff for a new easement to install the new pipe; (2) the defendant had paid the plaintiff's predecessor-in-title for the right to place the old sewer line on the property " 'forever' "; and (3) the defendant agreed and the parties stipulated that the defendant would be "'responsible for any assessment and/or remediation of contamination emanating from abandoned underground sewer lines on the [p]roperty[,]' to the extent required by state or federal statutes or federal, state, or local regulations[,]" this Court concluded that the defendant had already paid the plaintiff for the burden the buried

sewer line posed to its property and that the plaintiff was not entitled to be paid twice for that right. *Id.* at 757-58, 630 S.E.2d at 40.

In the instant case, there is no evidence that defendant or anyone else paid plaintiffs' predecessor-in-interest any compensation for the burden the old outfall posed to the property or for the old easement, nor does there appear to be any prior agreement describing the old easement or its terms. Also, there is no evidence in the record that the parties agreed that defendant would abandon the old outfall and that it would revert back to plaintiffs or that defendant would be responsible for any contamination emanating from it. However, as stated *supra*, it is undisputed that defendant had been utilizing both the old outfall and the old easement as part of its sewer system for decades. Consequently, we do not think the above case controls the outcome here.

Plaintiffs list eight possible dates on which they contend a "taking" could have occurred here. However, they argue that 26 April 2002, which is the date plaintiffs assert they first learned that their residence was connected to the old outfall, is the *"most* logical date" on which to determine the taking occurred because it is the earliest point at which they reasonably could have known of the damage to their property. In response, defendant contends that, under North Carolina law, it does not matter when a plaintiff becomes aware of the act constituting the alleged taking because the statute of limitations for an inverse condemnation claim begins to run at the moment the property first suffers injury, not when a plaintiff did or should have discovered it.

It is true that this Court has stated: "The rule is that a statute of limitations on an inverse condemnation claim begins running when plaintiffs' property first suffers injury." *Robertson v. City of High Point,* 129 N.C. App. 88, 91, 497 S.E.2d 300, 302 (citing *Lea Co. v. N.C. Board of Transportation,* 308 N.C. 603, 629, 304 S.E.2d 164, 181 (1983)), *disc. review denied,* 348 N.C. 500, 510 S.E.2d 654 (1998). However, we disagree with defendant that a property owner's awareness or discovery of the injury is irrelevant to when a claim for inverse condemnation begins to accrue. In fact, as discussed *infra,* decisions by this Court and our Supreme Court suggest the opposite is true. As this Court has stated: "Our courts have recognized there may be excusable delay in filing actions. The legislature, in enacting [N.C. Gen. Stat. §] 40A-51(a), sought to account for such delay and provide plaintiffs adequate opportunity to discover damage." *McAdoo,* 91 N.C. App. at 572, 372 S.E.2d at 743 (citations omitted).

Furthermore, in the three cases cited by defendant in support of its argument, this Court and/or our Supreme Court took the respective property owners' discovery or awareness of the injury to the property into account. In *Robertson*, immediately after stating the rule cited above, this Court proceeded to state:

> In the instant case, plaintiffs had reasonable opportunity to discover that their property was injured well before the running of the statute of limitations. Plaintiffs' complaint states the landfill operation caused damage to their property beginning 9 October 1993. However, the complaint was filed 23 December 1996. Plaintiffs "offer no explanation for their delay in filing this action, nor does it appear legally excusable . . . ." Therefore, plaintiffs have failed to comply with the statute of limitations in N.C. Gen. Stat. § 40A-51.

*Robertson*, 129 N.C. App. at 91, 497 S.E.2d at 302 (alteration in original) (quoting *Smith*, 79 N.C. App. at 523, 339 S.E.2d at 848). In *Lea Co.*, 308 N.C. at 609, 304 S.E.2d at 170, the plaintiff brought an inverse condemnation action against the defendant, asserting that defendant's highway structures increased the level of flooding on the plaintiff's property and caused substantial flood damage to the plaintiff's apartment buildings. Hence, the damage to the plaintiff's property in that case, substantial flood damage, would have been readily perceivable. Finally, in *Central Carolina Developers*, the plaintiff bought a lot in 1995, purportedly did not discover a sewer pipe running through it until 1997, and brought an inverse condemnation claim against the defendant in 1998 based on the presence of the pipe, which had been installed in or around 1989, because the presence of the pipe barred the plaintiff from constructing a residence. 148 N.C. App. at 565, 559 S.E.2d at 231. This Court determined that "any 'taking' would have occurred when the sewer pipe was installed across [the lot]" and that the plaintiff's claim was barred by the statute of limitations. *Id.* at 567, 559 S.E.2d at 232. However, in that case the "sewer pipe [was] 'clearly visible, and . . . above the water line of the creek,' crossing the creek on [the plaintiff's lot]." *Id.* at 565, 559 S.E.2d at 231. In other words, the plaintiff could have easily noticed the pipe's presence on the lot.

As stated *supra*, we believe that the act of eliminating the old outfall from service, which purportedly occurred in late 2000 or early 2001 and triggered the process via which plaintiffs' property was substantially damaged, is the earliest point in time at which it can be fairly argued that a taking occurred here. Assuming, *arguendo*, that

this is when the taking occurred, viewed in the light most favorable to plaintiffs, the forecast of evidence indicates that plaintiffs had no reason to know of the substantial interference with or damage to their property that eliminating the old outfall from service posed to their property. Admittedly, the noxious odors and poor draining that plaintiffs noticed subsequent to the old outfall being taken out of service and prior to learning that their house was connected to the old outfall might have arguably placed plaintiffs on notice of the injury to their property. However, we believe that a genuine issue of material fact exists as to whether any delay in filing their inverse condemnation action was excusable based on plaintiffs not having an "adequate opportunity to discover [the] damage" to their property, *McAdoo*, 91 N.C. App. at 572, 372 S.E.2d at 743, and thus, whether their action was timely filed in accordance with N.C. Gen. Stat. § 40A-51(a).

In sum, we hold that the earliest possible point at which it can be fairly argued that a taking occurred here is when defendant eliminated the old outfall from service. Assuming, *arguendo*, that this act constituted the taking, a genuine issue of material fact exists as to whether plaintiffs' had an adequate opportunity to discover the damage to their property, and thus, whether their action was timely filed in accordance with N.C. Gen. Stat. § 40A-51(a). Consequently, the trial court erred in granting summary judgment in defendant's favor based on the statute of limitations.

## C. Completion of the "Project"

[3] Plaintiffs also contend that a material issue of fact exists as to when the DSO Project was completed within the meaning of N.C. Gen. Stat. § 40A-51(a). Defendant contends that Breece conclusively completed its work on the DSO Project in November 2000, and, as a result, there is no issue of material fact as to whether plaintiffs brought their inverse condemnation claim within two years of the project's completion in accordance with section 40A-51(a). Both parties cite this Court's decision in *McAdoo*, 91 N.C. App. at 570, 372 S.E.2d at 742, in support of their arguments. As discussed *infra*, we agree with plaintiffs that, based on the forecast of evidence, a material issue of fact exists as to when the DSO Project was completed.

In *McAdoo*, this Court determined that where a larger road widening project was done in individual sections, each section met the definition of "'projects' for purposes of [N.C. Gen. Stat. §] 40A-51(a)." *Id.* at 572, 372 S.E.2d at 743. However, this Court further stated that the "completion of the 'project' " in accordance with section 40A-51(a)

does not necessarily equate to the "completion of construction." *Id.* at 573, 372 S.E.2d at 744. In that case, the widening of the particular section of road at issue was finished on 10 May 1984, the defendant-municipality made its final inspection and acceptance of the project on 31 May 1984, the municipality authorized final payment on 5 September 1984, and final payment was made on 7 September 1984. *Id.* at 571, 372 S.E.2d at 742. However, the contract between the municipality and the company that performed the construction required said company to maintain the road for three months after the defendant's acceptance until 31 August 1984. *Id.* This Court concluded:

> The fact that [the] defendant accepted the improvements is not relevant as it did so on [the] condition that the project be completed with necessary maintenance. [The d]efendant's authorization of final payment on 5 September 1984 and subsequent payment on 7 September 1984 show that [the] defendant did not consider the project completed until the maintenance period was over. For these reasons, we hold completion of the project was not until 31 August 1984, and the trial court erred in granting summary judgment to [the] defendant based on the statute of limitations."

*Id.* at 573, 372 S.E.2d at 744.

Defendant asserts that *McAdoo* is distinguishable because in that case, the maintenance period was part of the contractor's contractual obligations, and in contrast, here, all of the evidence in the record suggests that Breece was not contractually obligated to examine or make residential sewage system connections as part of the DSO Project. Consequently, defendant argues that Breece's return to properly connect plaintiffs' residence to defendant's sewer system in May 2002 was not the date of the "completion of the project involving the taking" pursuant to N.C. Gen. Stat. § 40A-51(a). In his affidavit, Mr. Adams testified that: "Breece performed the work in the area of plaintiffs' house in late 2000"; the old outfall was abandoned in December 2000 or January 2001 "as part of the [DSO] Project, with the new outfall . . . being connected to the sewage system in its place"; "Breece last submitted a billing to [defendant] for work on the [DSO] Project in early 2001"; and this billing covered the period from 15 November 2000 through 12 January 2001. In his affidavit, David N. Breece ("David Breece"), a Vice President of Breece, testified that: defendant did not contract with Breece to make residential connections at the Dayton Street·Outfall section; Breece did not encounter any residen-

tial lines during its work there; and Breece completed its construction work in November 2000. Finally, Robert S. Breece ("Robert Breece"), also a Vice President of Breece, stated in his affidavit that: the plans provided to Breece by defendant for the DSO Project did not show a residential connection from plaintiffs' property to the old outfall; Breece did not encounter any residential lines during its work there; Breece was not responsible for the connection of any residential lines at the Dayton Street Outfall; and when Breece removed a section of the old outfall, which ran under plaintiffs' property, to install the new outfall and bypass the old outfall, "there was no noticeable discharge of sewage."

There is no copy of any contract between defendant and Breece regarding the Overall Project or regarding the particular DSO Project present in the record on appeal. While we agree with defendant that there appears to be no evidence in the record that residential connections were part of the agreement between it and Breece, at the summary judgment hearing, Breece conceded that it did not fill the old outfall with flowable fill and cap it as required by defendant's plans for the DSO Project and as required by the contract. In addition, both David Breece and Robert Breece testified that the old outfall was not filled and capped until May 2002, and Robert Breece further testified that, between November 2000 and May 2002, sewage would have "exited the open ends [of the old outfall] much like a very large leech field."

Given the forecast of evidence that Breece did not fill and cap the old outfall as required by the plans and the contract at the time Breece purportedly finished its work on the DSO Project, plaintiffs assert that a material issue of fact exists as to whether the DSO project was completed prior to May 2002. Defendant argues that to the extent Breece's "May 2002 activities" were related to the DSO Project, said activities are more like "'repair' " work, which would not toll the statute of limitations or begin the running of a new statute of limitations period. As discussed *infra*, we agree with plaintiffs.

In support of its argument, defendant cites four cases: *Hodge v. Harkey*, 178 N.C. App. 222, 631 S.E.2d 143 (2006); *Whitehurst v. Hurst Built, Inc.*, 156 N.C. App. 650, 577 S.E.2d 168 (2003); *Bryant v. Don Galloway Homes, Inc.*, 147 N.C. App. 655, 556 S.E.2d 597 (2001); and *Monson v. Paramount Homes, Inc.*, 133 N.C. App. 235, 515 S.E.2d 445 (1999). These cases all address the issue of whether a party's claims for damages, which are based on or arise out of defec-

tive or unsafe conditions of improvements to real property, are barred by North Carolina's statute of repose, which states:

> No action to recover damages based upon or arising out of the defective or unsafe condition of an improvement to real property shall be brought more than six years from the later of the specific last act or omission of the defendant giving rise to the cause of action or the substantial completion of the improvement.

N.C. Gen. Stat. § 1-50(a)(5)(a) (2007). Hence, these cases implicate a different statutory provision than the case before us. Furthermore, "[u]nlike a statute of limitations, a statute of repose will begin to run when a specific event occurs, regardless of whether a cause of action has accrued or whether any injury has resulted." *Nolan*, 135 N.C. App. at 77, 518 S.E.2d at 792. In other words, "a statute of repose may operate to cut off a defendant's liability even before an injury occurs." *Id.*

This greatly contradicts what this Court has stated about the purpose of the statute of limitation contained in section 40A-51(a): "The legislature, in enacting [N.C. Gen. Stat. §] 40A-51(a), sought to account for [excusable delay in filing inverse condemnation actions] and provide plaintiffs adequate opportunity to discover damage." *McAdoo*, 91 N.C. App. at 572, 372 S.E.2d at 743-44. Furthermore, unlike in *Monson*, 133 N.C. App. at 238, 515 S.E.2d at 448, where this Court emphasized that the plaintiff had presented no evidence that the defendant had a continuing duty to complete repairs under the parties' original improvement contract, the forecast of evidence here tends to show that Breece did not fill and cap the old outfall in accordance with defendant's plans and their original agreement. In other words, the forecast of evidence indicates that Breece returned to plaintiffs' residence in May 2002 to perform work, which it had originally agreed to perform, but neglected to complete. Finally, we note that had Breece filled and capped the old outfall in November 2000, plaintiffs would have been able to discover the fact that their residence was connected to the old outfall instead of the main line without the 18 month delay, as both their wastewater and their neighbors' wastewater would have exited their respective homes into the old outfall, which would have been blocked. Instead, for over 18 months, the wastewater exited the respective homes, entered the old outfall, and poured out onto plaintiffs' property, allowing waste to accumulate, which substantially damaged plaintiffs' property.

"[A] municipality is solely liable for the damages that *inevitably or necessarily flow* from the construction of an

improvement . . . ." Thus, "[d]amages to land outside the easements which inevitably or necessarily flow from the construction of the [improvement] result in an appropriation of land for public use [to which] [s]uch damages are embraced within just compensation to which defendant landowners are entitled."

*City of Charlotte v. Long*, 175 N.C. App. 750, 753, 625 S.E.2d 161, 164 (2006) (alterations in original) (quoting *Ferrell*, 79 N.C. App. at 110, 338 S.E.2d at 799). In *Long*, the defendants asserted that the installation of a new septic system on their property, which included a pump tank, 400 feet of pipe and a new leach field, constituted an additional taking. In that case, the municipality had previously acquired a permanent sanitary sewer easement across the defendants' property to install a gravity sewer line and a pressurized sewer force main for a residential development, which rendered defendants' septic waste system inoperable. *Id.* at 751, 625 S.E.2d at 164. The defendants consented to the installation of the new septic system, and "the plaintiff reciprocated by expending $16,000.00 to cover the cost." *Id.* at 754, 625 S.E.2d at 164. This Court concluded:

> [The p]laintiff's installation of the pump, pipe, and field on [the] defendants' property did not *necessarily flow* from construction of the improvement, here the 8-inch sewer line and 16-inch sewer main force. The installation was not part of the improvement project, but rather the plaintiff's subsequent and separate effort to accommodate defendants' need for a new septic system. . . . [The d]efendants incorrectly assert [that] a separate taking has occurred.

*Id.* As stated *supra*, when the evidence in the record here is viewed in the light most favorable to plaintiffs, it tends to establish that eliminating the old outfall from service, abandoning the portion of the old outfall that ran beneath plaintiffs' property, and filling and capping the abandoned portion of the old outfall were part of the improvement project, and consequently, that the damages to plaintiffs' property did *necessarily flow* from construction of the improvement.

In sum, we hold that a genuine issue of material fact exists as to when the "project involving the taking" was completed in accordance with N.C. Gen. Stat. § 40A-51(a). Consequently, we hold that the trial court erred in granting summary judgment in defendant's favor based on the statute of limitations.

## IV. Conclusion

In sum, even if we assume, *arguendo*, that defendant's act of eliminating the old outfall from service constituted the "taking" here, we hold that a material issue of fact exists as to whether plaintiffs had an adequate opportunity to discover the damage to their property, and thus, whether their delay in filing their inverse condemnation action was legally excusable and timely filed in accordance with N.C. Gen. Stat. § 40A-51(a). Furthermore, we hold that a material issue of fact exists as to when the DSO Project was completed within the meaning of N.C. Gen. Stat. § 40A-51(a). Standing alone, each of these grounds is sufficient to support our conclusion that the trial court erred in granting summary judgment in defendant's favor based on the statute of limitations. Accordingly, we reverse the trial court's order and remand this case to the trial court for further proceedings.

Reversed and remanded.

Judges CALABRIA and HUNTER, Robert N., Jr. concur.