IN THE SUPREME COURT OF NORTH CAROLINA

No. 394PA21

Filed 6 April 2023

MICHAEL MOLE'

v.

CITY OF DURHAM, NORTH CAROLINA, a municipality

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 279 N.C. App. 583, 866 S.E.2d 773 (2021), affirming the trial court's dismissal of plaintiff's Article I, Section 19 claims and reversing the trial court's dismissal of plaintiff's Article I, Section 1 claim. Heard in the Supreme Court on 9 February 2023.

> *J. Michael McGuinness and M. Travis Payne for plaintiff-appellant.*
>
> *Kennon Craver, PLLC, by Henry W. Sappenfield and Michele L. Livingstone, for defendant-appellee.*
>
> *Norris A. Adams, II, Caitlin H. Walton, and Larry H. James for the National Fraternal Order of Police and the State of North Carolina Fraternal Order of Police, amici curiae.*
>
> *John W. Gresham for North Carolina Association of Educators and National Association of Police Organizations, amici curiae.*
>
> *Patterson Harkavy, LLP, by Narendra K. Ghosh and Trisha Pande, for Professional Fire Fighters and Paramedics Association of North Carolina and North Carolina Advocates for Justice, amici curiae.*

PER CURIAM.

Discretionary review improvidently allowed. The decision of the Court of

Appeals is left undisturbed but stands without precedential value. *See Costner v. A.A. Ramsey & Sons Inc.*, 318 N.C. 687, 351 S.E.2d 299 (1987) (stating that a published opinion of the Court of Appeals was without precedential value where the Court was "divided three to two as to the result and thus there being no majority of the Court[.]").

DISCRETIONARY REVIEW IMPROVIDENTLY ALLOWED.

Justice DIETZ concurring.

It might seem odd to write a separate opinion concurring in a boilerplate, two-sentence order from this Court. But my dissenting colleagues have managed to write a combined thirty-two pages in response to this order, so adding a few extra paragraphs feels quite reasonable by comparison. And I write separately solely because a reader trekking through these two lengthy dissents is owed some context about what is really going on here.

First, with respect to "unpublishing" a Court of Appeals opinion, this is nothing new. This Court has done so just shy of 100 times in the last fifty years, most recently this past November. *Townes v. Portfolio Recovery Assocs., LLC*, 382 N.C. 681, 682 (2022) (holding that "the decision of the Court of Appeals is left undisturbed and stands without precedential value").

Now, to be sure, many of these orders were because there was a recusal and this Court's remaining members were equally divided, which is not the case here. But the point is that "unpublishing" a Court of Appeals opinion is far from unprecedented. Indeed, this practice is so noteworthy that one legal scholar wrote an entire law review article about it, explaining that the effect of these rulings is to render the Court of Appeals opinions "of no more precedential value than the decision of a trial

- 3 -

court." John V. Orth, *"Without Precedential Value"—When the Justices of the Supreme Court of North Carolina Are Equally Divided*, 93 N.C. L. Rev. 1719, 1735 (2015).

And, more importantly, this practice is *not* limited solely to cases where the voting members of this Court were equally divided. We also have unpublished Court of Appeals opinions when the Court was not equally divided but, nevertheless, there was "no majority of the Court" voting for any given outcome. *Costner v. A.A. Ramsey & Sons Inc.*, 318 N.C. 687 (1987); *Nw. Bank v. Roseman*, 319 N.C. 394, 395 (1987).

Of course, by using the phrase "majority of the Court" in these cases, we meant a majority of the *full court*. When this Court is divided three to two with two recusals, as happened in *Costner* and *Roseman*, the Court always has the power to enter a precedential decision by the three justices in the voting majority. Indeed, we have done so in several recent cases. *E.g., Connette for Gullatte v. Charlotte-Mecklenburg Hosp. Auth.*, 382 N.C. 57, 58 (2022) (overturning 100-year-old medical malpractice precedent by 3-2 vote with two recusals). But when there is no majority of the full court voting for a particular disposition, this Court has long had the *option*—one we used in *Costner* and *Roseman*—to take no action on the merits and to render the Court of Appeals decision non-precedential, so that the issue could continue to percolate in the lower courts. *Costner*, 318 N.C. at 687; *Roseman*, 319 N.C. at 395.

Cases like *Costner* and *Roseman*—where there was no majority vote for how to resolve the case—bring me to my second point. As anyone watching the oral argument

in this case could observe, the justices' questions revealed several alternative ways to decide the case, none of which could be reconciled with the others.

When this happens in appellate cases, if there is no majority for any one approach in the voting conference, the result is often a series of plurality and minority opinions that are a complete mess to decipher. Moreover, those competing opinions can make the law less settled and make the surrounding confusion about the law even worse.

How do courts of last resort, exercising discretionary review, avoid creating these sorts of messy rulings with no majority holding? They can dismiss a case by announcing that their discretionary decision to review it was improvident. Again, this practice is hardly unprecedented. This Court has done so well over 100 times, including several times last year. *E.g.*, *State v. Boyd*, 381 N.C. 169 (2022). And again, scholars have acknowledged that a court's "jurisprudence would be better served" by this practice when "the justices are at loggerheads and see that an opinion is going to go eight ways." H.W. Perry, Jr., *Deciding to Decide: Agenda Setting in the United States Supreme Court* 39, 111 (1991).

One final point: I am not fond of unpublishing a Court of Appeals decision. I served on the Court of Appeals twice as long as all the other members of this Court combined. The Court of Appeals' ability to create its own body of binding precedent is essential to our State's jurisprudence. Similarly, I am not fond of dismissing a case

for review improvidently allowed. If we took a case based on the statutory criteria for review, that is a strong indication that the case deserves resolution on the merits.

Having said that, there is precedent for taking both of these steps. And there will be rare cases where it is appropriate for this Court to do so because doing otherwise would only make things worse. I concur in the Court's order because this is one of those rare cases.

Justice BERGER joins in this concurring opinion.

Justice MORGAN dissenting.

I respectfully dissent from both the majority's determination that discretionary review was improvidently allowed in the present case as well as this Court's unprecedented unpublication of the Court of Appeals opinion rendered in this case, *Mole' v. City of Durham*, 279 N.C. App. 583 (2021). In my view, the issues raised by the parties regarding the applicability of the Fruits of Labor Clause of Article I, Section 1 of the Constitution of North Carolina as previously interpreted by this Court in *Tully v. City of Wilmington*, 370 N.C. 527 (2018), as well as the viability of class-of-one equal protection claims for public employees under Article I, Section 19 of the Constitution of North Carolina, easily met this Court's requirements for discretionary review as described by the General Assembly. This Court's review of this challenging case which invokes two momentous state constitutional provisions would have provided crucial direction into uncharted constitutional terrain, while appropriately allowing North Carolina's highest court to determine a resolution of plaintiff's constitutionally significant claims. I therefore respectfully disclaim the majority's refusal to clarify the reach of *Tully* or the viability of class-of-one claims in the employment context, along with the majority's simultaneous decision to strip the Court of Appeals opinion here of its own precedential effect, thereby calculatedly eliminating any North Carolina appellate court examination of the pivotal constitutional principles illuminated by this case.

On 28 June 2016, the Durham Police Department dispatched officers to an apartment complex in Durham in order to serve an arrest warrant on Julius Smoot. Upon their arrival, the officers discovered that Smoot had barricaded himself in an upstairs bedroom and claimed to be armed with a firearm. Smoot represented that he would kill himself unless he was allowed to see his wife and son within ten minutes. As a result, the law enforcement officers contacted their supervising officers for the purpose of requesting that a hostage negotiator be sent to the scene.

Plaintiff, who had begun working for the Durham Police Department in May 2007 and held the rank of sergeant on 28 June 2016, was the only hostage negotiator on duty when the request for a hostage negotiator was made. Although plaintiff had received hostage negotiation training in May 2014, he had not ever participated in a barricaded subject or hostage situation until this event occurred. Upon arriving at the apartment approximately five minutes after the police department had received the request for negotiation assistance with Smoot, plaintiff began talking with Smoot in an effort primarily to keep Smoot alive and to extend Smoot's stated deadlines to meet Smoot's demands. In the course of his interactions with Smoot, plaintiff heard the sound of a gunshot come from the interior of Smoot's apartment, at which point Smoot assured plaintiff that the gunshot was accidental.

After the negotiations had proceeded for about two hours, during which time Smoot became "highly agitated," Smoot told plaintiff that Smoot had a "blunt"[1] and

---

[1] A marijuana cigarette.

intended to smoke it. In light of plaintiff's concerns that the effects of marijuana consumption might exacerbate Smoot's precarious emotional state and could result in even more danger to himself and the law enforcement officers, plaintiff asked Smoot to refrain from smoking the marijuana cigarette and, in return, plaintiff would allow Smoot to smoke the "blunt" if Smoot would peacefully surrender himself and the firearm. After agreeing to plaintiff's proposal, Smoot handcuffed himself, left the gun in the bedroom of the apartment, and surrendered to plaintiff while still in the apartment. As Smoot waited in the living room of the apartment to meet with his son, Smoot asked for Smoot's lighter and pack of cigarettes, which plaintiff placed on the table in front of Smoot. Smoot then removed the marijuana cigarette from behind his ear, lit it with his lighter, and smoked about half of it prior to his son's arrival.

In the aftermath of these events, the Durham Police Department initiated an internal investigation into plaintiff's actions. On 24 October 2016, plaintiff received written notice that a predisciplinary hearing would take place on the following day despite the fact that municipal policy provided that City of Durham employees were entitled to notice of at least three business days before such a hearing could be held. After the hearing was conducted on 25 October 2016, plaintiff's immediate supervisors recommended that plaintiff be demoted. However, defendant City of Durham terminated plaintiff's employment on 14 November 2016 for "conduct unbecoming" a municipal employee based upon the manner in which he secured Smoot's surrender.

On 13 November 2018, plaintiff filed a complaint against the City of Durham which alleged that the City had violated his constitutional rights to due process, equal protection, and the fruits of his labor. On 17 January 2019, the City filed an answer to plaintiff's complaint in which the City denied the material allegations of plaintiff's complaint and moved to dismiss the action for failure to state a claim upon which relief could be granted pursuant to N.C.G.S. § 1A-1, Rule 12(b)(6). On 24 May 2019, the trial court entered an order granting the City's dismissal motion. Plaintiff appealed this outcome to the Court of Appeals.

In recognizing that plaintiff asserted in his complaint that his rights to due process, equal protection, and the fruits of his labor under the Constitution of North Carolina were violated, the Court of Appeals interpreted this Court's decision in *Tully* to acknowledge that plaintiff had adequately pleaded a claim for relief under the state constitution with regard to the City's failure to abide by their established disciplinary procedures. *Mole'*, 279 N.C. App. at 586. The majority of the Court has decided to utilize this case to inaugurate the extraordinary measure of unpublishing this Court of Appeals opinion, thus leaving the opinion bereft of any precedential value upon the majority's conclusion that discretionary review of this case was improvidently allowed.

Section 7A-31 of the North Carolina General Statutes governs the subject of discretionary review by this Court. In relevant part, section 7A-31 provides that:

> (c) In causes subject to certification under subsection (a) of this section, certification may be made by the Supreme

Court after determination of the cause by the Court of Appeals when in the opinion of the Supreme Court any of the following apply:

(1) The subject matter of the appeal has significant public interest.

(2) The cause involves legal principles of major significance to the jurisprudence of the State.

(3) The decision of the Court of Appeals appears likely to be in conflict with a decision of the Supreme Court.

N.C.G.S. § 7A-31(c) (2021). Plaintiff petitioned this Court for discretionary review pursuant to section 7A-31(c)(2) and (3), arguing both that the Court of Appeals opinion involved legal principles of major significance to the jurisprudence of the state and that the lower court's decision appeared to be in conflict with decisions of this Court; primarily, the momentously precedential case of *Tully*. Even the Court of Appeals itself, in its now-erased decision which it issued in this case, urged this Court to provide guidance with regard to the application of the Equal Protection Clause of the Constitution of North Carolina as compared to the federal counterpart of the fundamental rights protections established in the Equal Protection Clause of the United States Constitution. *Mole'*, 279 N.C. App. at 598 ("Because our constitution is to be liberally construed, we urge the Supreme Court to address this issue.").

Upon this Court's determination to accord discretionary review to this compelling case, the legal briefs subsequently submitted by the parties, along with three separate clusters of amici curiae composed of organizations with varying

orientations and corresponding varying perspectives, underscored both the jurisprudential and policy implications of the complex constitutional issues presented by plaintiff's case. On one side, plaintiff and supportive amici curiae argued that the internal logic of this Court's previous decision in *Tully* and the interpretation of the Fruits of Labor Clause established by *Tully* were not necessarily constrained to the case's specific fact pattern. They also reminded us that this Court is not bound to construe provisions of the Constitution of North Carolina identically to their federal analogues, even where the language is exactly mirrored. *Evans v. Cowan*, 122 N.C. App. 181, 183–84, *aff'd per curiam*, 345 N.C. 177 (1996). Indeed, our state courts have in many instances found it proper to give the Constitution of North Carolina a more "liberal interpretation in favor of [North Carolina's] citizens," *Corum v. Univ. of N.C.,* 330 N.C. 761, 783 (1992), and to grant relief in circumstances where no relief would be afforded under the federal constitution. *Evans*, 122 N.C. App. at 184. Amici curiae which supported plaintiff's legal stances here also emphasized the increasingly challenging and often dangerous working conditions of public employees—especially first responders like Mole'[2], whose lives *and* livelihoods can be endangered by government employers' refusal to abide by their own internal policies.

On the other side, defendant asked this Court to reconsider the Court of Appeals decision pronounced here, but also to reduce *Tully* expressly to the case's

---

[2] The record before us contains two variations of plaintiff's surname—Molé and Mole'. In conformity with the majority of the legal documents before us, we have chosen to spell plaintiff's name as Mole'.

explicit holding concerning arbitrary refusals by government employers to follow their own personnel policies in promotional processes. Defendant contended that plaintiff's arguments possessed no meaningful limiting principle and therefore could be expanded well beyond the facts of his particular case. Defendant argued that *any* expansion of either the Fruits of Labor Clause or the Equal Protection Clause of the Constitution of North Carolina which would recognize plaintiff's claims as cognizable under state law would effectively nullify existing case law recognizing public employees as being employed at-will and would have the additional effect of exposing any municipal or operational policy enacted by a government employer to potential constitutional claims from public employees. For these reasons, defendant asked this Court to reject plaintiff's "novel claims" in order to preserve the at-will posture of public employment and managerial discretion of government employers.

Although the legal briefs submitted by the named parties and other interested parties highlighted the delicacy of resolving such intricate constitutional questions concerning the government's role as employer, there was nothing about the parties' submissions or their positions that suggested that this case did not legitimately harbor significant public interest, involve legal principles of major significance to the jurisprudence of the State, or present the question of a likely conflict between the Court of Appeals decision issued here and a decision of this Court, to wit: *Tully*. Likewise, there was nothing about the parties' respective presentations of their oral arguments to the Court that indicated that this case did not satisfy *any* of the above-

referenced criteria established in N.C.G.S. § 7A-31(c) to warrant this Court's allowance of discretionary review.

It is therefore puzzling for me to identify a reasonable set of circumstances to reconcile this Court's institutionalized propensity to address complex constitutional issues with the majority's intentional dual avoidance here of the existence of any appellate court direction in this matter by virtue of the majority's unusual passiveness to review constitutional subjects, coupled with the majority's sensational aggressiveness to unpublish a major Court of Appeals opinion. The complexity of the issues and interests involved in this case, the intrinsic nature of which creates discomfort for the majority to render a binding opinion here, provides a detectable reticence of the majority to proverbially bury its head in the sand and to neglect this Court's obligation to answer necessary constitutional questions through the interpretation of state law. *See Union Carbide Corp. v. Davis,* 253 N.C. 324, 327 (1960) ("Courts must pass on constitutional questions when, but only when, they are squarely presented and necessary to the disposition of a matter then pending and at issue."); *see also Lea Co. v. N.C. Bd. of Transp.*, 308 N.C. 603, 610 (1983) ("Only this Court may authoritatively construe the Constitution and laws of North Carolina with finality.").

I embrace the concurrence's invitation to explore "what is really going on here" regarding the unpublication of the Court of Appeals opinion in the present case and

the majority's determination that discretionary review of this matter was improvidently allowed.

Between the Court majority's per curiam opinion and the supportive concurring opinion, the two opinions utilize the terms "unpublishing" / "unpublished" and "without precedential value" interchangeably with regard to the Court's own eradication of the Court of Appeals opinion, in an effort to diminish the true irregular, unprecedented nature of this action. This Court's per curiam opinion in *Costner v. A.A. Ramsey and Sons, Inc.*, 318 N.C. 687 (1987) is cited by the majority as legal precedent for its "Discretionary Review Improvidently Allowed" opinion. In *Costner*, this Court expressly observed that two Justices of the seven-member forum—Justices Webb and Whichard—did not participate in the outcome of the case, and that with

> [t]he remaining members of this Court being divided three
> to two as to the result and thus there being no majority of
> the Court voting to either affirm or reverse, the decision of
> the Court of Appeals is left undisturbed and stands without
> precedential value.
>
> AFFIRMED.

*Id.* at 687.

This Court has similarly issued per curiam opinions in other cases in which there was not a majority of the Justices to vote for the same outcome in the resolution of a case, thus prompting the Court to declare that the Court of Appeals decision would be left undisturbed and stand without precedential value. For example, in *Northwestern Bank v. Roseman*, 319 N.C. 394 (1987), we stated in a per curiam

opinion:

> Justices Martin and Webb took no part in the consideration or decision of this case. The remaining members of the Court being divided three to two as to all issues presented and thus there being no majority of the Court voting to either affirm or reverse, the decision of the Court of Appeals is left undisturbed and stands without precedential value.
>
> AFFIRMED.

*Id.* at 395.

In *Couch v. Private Diagnostic Clinic*, 351 N.C. 92 (1999), we stated in a per curiam opinion:

> Justice Freeman did not participate in the consideration or decision of this case. . . . All members of the Court are of the opinion that the trial court erred by not sustaining defendant's objection and by not intervening *ex mero motu*. Justices Lake, Martin, and Wainwright believe that the error was prejudicial to the appealing defendant and would vote to grant a new trial. Chief Justice Frye and Justices Parker and Orr are of the opinion that the error was not prejudicial to the appealing defendant and would vote to affirm the result reached by the Court of Appeals. Accordingly, the decision of the Court of Appeals is left undisturbed and stands without precedential value.
>
> The decision of the Court of Appeals is affirmed without precedential value.
>
> AFFIRMED.

*Id.* at 93.

We also issued a per curiam opinion in the determination of *Townes v. Portfolio Recovery Assocs., LLC*, 382 N.C. 681 (2022), opining:

> Justice Ervin took no part in the consideration or decision of this case. The remaining members of the Court are equally divided, with three members voting to affirm and three members voting to reverse the decision of the Court of Appeals. Accordingly, the decision of the Court of Appeals is left undisturbed and stands without precedential value. . . .
>
> AFFIRMED.

*Id.* at 682 (citation omitted).

While both the majority's per curiam opinion and the concurring opinion which have been issued here rely on this Court's cited opinions, which were decided in the same vein as numerous other per curiam opinions in which this Court has directed that the Court of Appeals opinion under review was without precedential value because there was not a majority of the Court which voted to affirm or reverse the lower appellate court's determination, there are two stark omissions from the majority's current per curiam opinion that appear in the similar line of cases upon which the majority relies: (1) a transparent divulgence of the numerical breakdown of the Justices favoring affirmance or reversal of the Court of Appeals decision, and (2) the Court's clear declaration of the outcome of the case—"AFFIRMED" or "REVERSED"—based upon the lack of precedential value of the Court of Appeals opinion. In examining this Court's per curiam opinions cited here as authority by the majority and buttressed by the concurrence, along with additional harmonious per curiam opinions issued by us, all of the Court's previous cases cited here—*Costner*, *Northwestern Bank*, *Couch*, and *Townes*—revealed the identities of any Justices who

did not participate in the outcome of the case, and disclosed the numerical vote of the remaining participating Justices which did not constitute a majority of votes on the Court to either affirm or reverse (i.e., 3-2 votes in *Costner* and *Northwestern Bank*) or which created a tie vote (i.e., 3-3 votes in *Couch* and *Townes*). Curiously, the majority, though painstakingly duplicating the Court's standard language that "the decision of the Court of Appeals is left undisturbed and stands without precedential value," somehow fails to replicate the disclosure of the specific votes of Chief Justice Newby, Justice Berger, Justice Barringer, Justice Dietz, and Justice Allen[3] as the Court did with each Justice's identified vote in *Couch*, or even to indicate the number of Justices who voted in one fashion or another in a manner which caused the Court of Appeals opinion to be without precedential value.

Furthermore, while all of the cases cited among the majority, the concurrence, and this dissent in the present case illustrate this Court's established practice of concluding a per curiam opinion with a definitive declaration of the case's outcome such as "affirmed" or "reversed" with regard to this Court's pronouncement that a Court of Appeals opinion theretofore will be "without precedential value," the majority interestingly neglected such clarity on this occasion. If the majority had employed this Court's well-established practice in cases which are resolved in the manner in which the majority has selected here, this Court would have made it plain

---

[3] Justices Morgan and Earls have recorded their respective dissenting votes in this case.

that the Court of Appeals opinion was still effective in that discretionary review was improvidently allowed and that the Court of Appeals opinion would afford plaintiff the opportunity to pursue his claim against defendant municipality based on plaintiff's constitutional claim lodged under Article I, Section I of the North Carolina Constitution. This Court has traditionally even employed this direct and transparent approach in its per curiam opinions which result in a determination of discretionary review improvidently allowed, as shown in our per curiam opinion issued in *John Conner Constr., Inc. v. Grandfather Holding Co., LLC*, 366 N.C. 547 (2013):

> Justice Beasley took no part in the consideration or decision of this case. The remaining members of the Court are equally divided, with three members voting to affirm and three members voting to affirm and three members voting to reverse the decision of the Court of Appeals. Accordingly, the decision of the Court of Appeals stands without precedential value. As to the issue allowed in plaintiffs' petition for discretionary review, we hold that discretionary review was improvidently allowed.
>
> AFFIRMED; DISCRETIONARY REVIEW IMPROVIDENTLY ALLOWED.

*Id.* at 547.

Here, in the majority's per curiam opinion that discretionary review was improvidently allowed, the decision ends with the sole declaration of "DISCRETIONARY REVIEW IMPROVIDENTLY ALLOWED." The majority glaringly fails to adhere to this Court's tradition, with the issuance of a per curiam opinion, to unequivocally announce the ultimate outcome of the case in the last line of the opinion, such as the opinion of the Court of Appeals being affirmed or reversed.

On its face, it appears that the majority has seen fit to initiate a new practice of refraining from such a plain announcement of the final result of a case in order to be consistent with this Court's new practice of unpublishing a Court of Appeals opinion on this Court's own volition. With this approach, there would be no requirement for this Court to declare the conclusive result of a per curiam opinion—including one in which discretionary review was improvidently allowed—because this Court would no longer recognize the lower appellate court's opinion to exist, due to this Court's unilateral unpublication of the Court of Appeals opinion.

I do not agree with this majority's departures from well-established and time-honored practices, traditions, and customs of this Court merely because these deviations conveniently serve the majority's interests. The concurrence here engages in a tutorial discussion of the myriad of circumstances which a court can confront during its deliberations in a case which may ultimately end with an outcome that discretionary review was improvidently allowed. The concurrence even endeavors to intimate the existent circumstances in the present case which led to the majority's determination that discretionary review was improvidently allowed. The learned concurring Justice should not be placed in a position to attempt to explain the awkward aspects of this case's situation which he and the Court's other distinguished colleagues in the majority have implemented with their decision. In the first instance, this Court should definitively decide the critical constitutional issues which have been presented to us, especially those which are impacted by the North Carolina

Constitution, since discretionary review by this Court is essential here to resolve substantial questions of law. And in the second instance, since the majority has deemed discretionary review to be improvidently allowed in the instant case, then it should follow the institutionalized precedent set by our per curiam opinions of *Costner*, *Northwestern Bank*, *Couch*, *Townes*, and *John Conner Constr., Inc.* and others to disclose, at the least, the numerical breakdown of the Justices here who favored affirmance, reversal, or some other reviewing disposition of the Court of Appeals, instead of adeptly utilizing the concepts of discretionary review improvidently allowed and unpublication of the Court of Appeals opinion to craftily shield their votes.

It is always within this Court's discretion to deny review where no appeal may be had as a matter of right. Likewise, it is within this Court's discretion to determine that it would be improvident to exercise our discretionary review over a matter previously evaluated as being appropriate for such review. However, I believe that a greater improvidence is flaunted when this Court leaves constitutional questions of such jurisprudential import as those presented here without any guiding appellate authority, either from this Court or in the form of a published opinion of the Court of Appeals, due to clear and convenient unwillingness to engage with the issues at hand.

I respectfully dissent.

Justice EARLS joins in this dissenting opinion.

Justice EARLS dissenting.

I join Justice Morgan's dissent in this matter. I write separately to address two procedural issues. The majority concludes that discretionary review was improvidently allowed (DRIA) and therefore in theory, no review on the merits has occurred in this Court. Simultaneously, the Court for the first time in its history, when sitting as a seven-member court, is, without coherent explanation, ruling that the opinion issued by the Court of Appeals in this case has no "precedential value."As the opinion was published by the Court of Appeals, under our Rules of Appellate Procedure, it should be binding precedent unless reversed by this Court. *In re Civil Penalty*, 324 N.C. 373, 384 (1989). Because this Court's unspoken assertion of its authority to decide which Court of Appeals opinions have precedential value is the most destructive to the administration of justice, I begin with that aspect of today's two-line majority opinion.

## I. "Unpublishing" a Court of Appeals Decision

The majority's decision to effectively "unpublish" the Court of Appeals decision in this case by denoting it as "without precedential value" does not have the doctrinal support the majority would wish it to have. None of the cases relied upon in the concurring opinion involved the full court, without explanation, deciding that discretionary review was improvidently granted while simultaneously holding that the Court of Appeals opinion will have no precedential effect. Not a single one. There

is no precedent for what the Court does in this case. Vague references to oral argument with insinuations that this was a complicated case that divided the court do not distinguish it from the many complicated issues the court faces that often involve multiple possible outcomes.

The majority's effort to hide the ball through sleight of hand is all the more appalling because having moved the cups around, they can't remember where it is. While the per curiam opinion implies through its citation to *Costner v. A.A. Ramsey & Sons*, Inc., 318 N.C. 687 (1987) that this Court chose to unpublish the Court of Appeals opinion in this case because "the Court was 'divided three to two as to the result and thus there . . . [was] no majority of the Court,' "[1] *See Mole' v. City of Durham*, No. 394PA21, ___ N.C. ___, (April 6, 2023) (per curiam), the concurrence essentially states the opposite, *see id.* (Dietz, J., concurring). The concurrence points out that while in many cases a Court of Appeals opinion will be designated as having no precedential value "because there was a recusal and this Court's remaining members were equally divided, [that] is not the case here." *Id.* (Dietz, J., concurring). This inconsistency alone is sufficient to alert readers as to "what is really going on here." *See id.* Furthermore, because there are only two dissenting opinions in this

---

[1] Ironically, and completely contrary to *Costner*, the Court is simultaneously issuing an opinion of the Court in *State v. Hobbs,* No. 263PA18-2, in which two Justices are recused and the remaining five members of the Court are divided three to two, without in any way suggesting that there was no majority of the Court or that the Court of Appeals opinion in that case therefore is without precedential value. Such an arbitrary and disparate application of procedural rules is the antithesis of due process and equal justice under the law. *Compare Costner,* 318 N.C. at 687 *with State v. Hobbs,* No. 263PA18-2, ___ N.C. ___, (April 6, 2023).

case it is clear this case's per curiam opinion constitutes the majority, thus leaving no room for a "three to two" split, *see id.* (per curiam), or an "equally divided court," *see id.* (Dietz, J., concurring). The parties in this case and the citizens of this state deserve better than a shell game.

It is unwise for the Court to hand itself this new power without even publishing an amendment to the Rules of Appellate Procedure to establish clear and fair guidelines for taking such action. The Court is making a hasty and unexamined, yet fundamental and radically destabilizing shift in the authority to determine legal precedent. It has far-reaching implications for the jurisprudence of this state. "[T]he rules governing publication of and citation to judicial opinions are not only central to the judiciary's self-identity—they are also critical to lawyers and the public, shaping how litigants' cases are treated by the courts and how litigants communicate with courts through their counsel." Scott E. Gant, *Missing the Forest for a Tree: Unpublished Opinions and New Federal Rule of Appellate Procedure 32.1,* 47 B.C. L. Rev. 705, 734 (2006) [hereinafter Gant, *Missing the Forest for a Tree*].

Rule 30(e) of the North Carolina Rules of Appellate Procedure has careful guidelines for how the precedential value of Court of Appeals opinions should be determined. It states that:

> (1) In order to minimize the cost of publication and of providing storage space for the published reports, the Court of Appeals is not required to publish an opinion in every decided case. If the panel that hears the case determines that the appeal involves no new legal principles and that an opinion, if published, would have no value as a

precedent, it may direct that no opinion be published.

(2) The text of a decision without published opinion shall be posted on the opinions web page of the Court of Appeals at https://appellate.nccourts.org/opinion-filings/coa and reported only by listing the case and the decision in the advance sheets and the bound volumes of the North Carolina Court of Appeals Reports.

(3) An unpublished decision of the North Carolina Court of Appeals does not constitute controlling legal authority. Accordingly, citation of unpublished opinions in briefs, memoranda, and oral arguments in the trial and appellate divisions is disfavored, except for the purpose of establishing claim preclusion, issue preclusion, or the law of the case. If a party believes, nevertheless, that an unpublished opinion has precedential value to a material issue in the case and that there is no published opinion that would serve as well, the party may cite the unpublished opinion if that party serves a copy thereof on all other parties in the case and on the court to which the citation is offered. This service may be accomplished by including the copy of the unpublished opinion in an addendum to a brief or memorandum. A party who cites an unpublished opinion for the first time at a hearing or oral argument must attach a copy of the unpublished opinion relied upon pursuant to the requirements of Rule 28(g). When citing an unpublished opinion, a party must indicate the opinion's unpublished status.

(4) Counsel of record and pro se parties of record may move for publication of an unpublished opinion, citing reasons based on Rule 30(e)(1) and serving a copy of the motion upon all other counsel and pro se parties of record. The motion shall be filed and served within ten days of the filing of the opinion. Any objection to the requested publication by counsel or pro se parties of record must be filed within five days after service of the motion requesting publication. The panel that heard the case shall determine whether to allow or deny such motion.

N.C. R. App. P. 30(e). Nothing in this detailed set of procedures would give any party

notice that the North Carolina Supreme Court might take it upon itself to "overrule" a Court of Appeals determination that an opinion of that Court has precedential value while leaving the opinion otherwise undisturbed.

In terms of how appellate procedure rules should be adopted, while Article IV, Section 13(2) of the Constitution of North Carolina vests in the Supreme Court "exclusive authority to make rules of procedure and practice for the Appellate Division," N.C. Const. art. IV, § 13(2), this Court has previously enjoyed a strong working relationship with the Appellate Rules Committee of the North Carolina Bar Association. Indeed, that Committee has been advising the Court concerning the Rules of Appellate Procedure at least since 1974 when the North Carolina Bar Association Foundation's Appellate Rules Study Committee proposed the form of appellate rules that we use today, creating a unitary set of rules that combined three prior rule sets: The Supreme Court Rules, the Court of Appeals Rules, and the "Supplemental Rules" that defined the practice and procedure in appeals within the appellate division. *See* App. Rules Study Comm., N.C. Bar Ass'n Found., *Proposed Draft of the North Carolina Rules of Appellate Procedure with General Commentary* 1 (1974). The 1974 Committee included forty-three distinguished attorneys and jurists from across the state, some of whom later served on this Court and other appellate courts. The current committee likewise is composed of lawyers and judges from across the state who are dedicated to improving the quality of appellate practice in North Carolina. They previously have had an instrumental role in proposing,

examining, and refining numerous revisions and clarifications of the rules. *See App.*

*Rules*, N.C. Bar Ass'n,

https://www.ncbar.org/members/communities/committees/appellate-rules/ (last

visited Jan. 29, 2023).

While there is no constitutional or other mandate requiring this Court to

consult with interested stakeholders prior to revising the Rules of Appellate

Procedure, it is universally understood throughout the legal profession to be good

practice to engage the most esteemed and experienced legal experts before modifying

the rules that govern our legal system. The North Carolina Bar Association's

Appellate Rules Committee can identify possible unintended consequences or

implications for practitioners that this Court may overlook. In general, consultation

and input from affected parties are important elements of improving the

administration of justice.

Therefore, I object in the first instance because this Court is summarily making

a fundamental change in how legal precedent is determined in this state without any

opportunity for notice and comment from knowledgeable and experienced members

of the bar and the judiciary, whether they are on a committee devoted to this issue or

otherwise interested individuals with valuable expertise.

On the merits of unpublishing a lower court opinion without explanation, it is

notable that very few states allow their supreme courts to unilaterally determine

when an opinion of an intermediate appellate court will be published and therefore

have precedential value. California and Kentucky are two examples that comprise this minority. *See* Melissa M. Serfass & Jessie W. Cranford, *Federal and State Court Rules Governing Publication and Citation of Opinions,* 3 J. App. Prac. & Process 251, 258–85 tbl.2 (2001); *see also* Cal. Rules of Court, rule 8.1105(e)(2). This Court should be both informed about the experiences of the few states that allow this practice and wary of adopting a rule that is seldom used without closer examination.

To illustrate the consequences this new rule may trigger, one scholar at the University of Louisville School of Law observed that Kentucky's rule not allowing the citation of unpublished opinions as legal authority creates the perception that "non-publication is a rug under which judges sweep whatever they wish never to see the light of day." Edwin R. Render, *On Unpublished Opinions,* 73 Ky. L. J. 145, 164 (1984) [hereinafter Render, *On Unpublished Opinions*]; *see also* David S. Tatel, *Some Thoughts on Unpublished Decisions,* 64 Geo. Wash. L. Rev. 815, 818 (1996) (allowing citation of all court opinions increases public confidence in the courts, "eliminating any basis for believing that the court is dispensing second-class justice to some parties").

California's widely denounced depublication rule has been similarly criticized on the basis "that the public's expectation of justice fairly and consistently dispensed will be undermined by 'hidden' decisions, and that judicial accountability will be rendered impossible by the suppression of the tangible evidence of judges' work." Philip L. Dubois, *The Negative Side of Judicial Decision Making: Depublication as a*

*Tool of Judicial Power and Administration on State Courts of Last Resort*, 33 Vill. L. Rev. 469, 476 (1988). Moreover, "depublication has become part of 'a process of covert substantive review which allows [a] supreme court to dispose of an objectionable interpretation of law without having to risk the exposure involved in hearing a case and reversing it on reasoned basis." *Id.* at 478 (cleaned up). For this Court to take it upon itself to decide an already published opinion of the Court of Appeals will have no precedential value actually illustrates the problem of covert substantive review.

Further indication that the procedure used in this case is unwise is found in the fact that the question of when an appellate court opinion should become precedential has been the subject of extensive scholarly examination for many years. In 1973, the Advisory Council on Appellate Justice of the Federal Judicial Center, in collaboration with the National Center for State Courts, assembled a group of lawyers, law professors, and judges to study state and federal appellate systems in the United States. *See* Advisory Couns. on App. Just., Comm. on Use of App. Ct. Energies, *Standards for Publication of Judicial Opinions* (1973). In its model rule developed after extensive study of the practices of state and federal appellate courts across the country, the judges who decide the case are to consider the question of whether to publish the opinion and thereby make it binding precedent, based on clear and well-established criteria applied equally to every case. According to those model rules, the highest court in the state may order any unpublished opinion of the intermediate court to be published, but the reverse is not contemplated. *Id.* app. 1 at

22. No one recommends this as a good idea, only a handful of other states do it, and it has the effect of taking away from the intermediate court that heard the case the power to set precedent.

The Court's action in this case gave the parties no opportunity to be heard on the question of whether the opinion should have precedential effect, even though as currently drafted the Rules of Appellate Procedure do give litigants the opportunity to make a motion in the Court of Appeals and thereby be heard if they believe an opinion designed by the panel as "unpublished" should be published. *See* N.C. R. App. P. 30(e)(4). The Court's order is inconsistent with the spirit and purpose of the current rules in this regard.

Legal scholars and judges have questioned the constitutionality of issuing appellate opinions that are unpublished and therefore of no precedential value, particularly on legal issues otherwise not the subject of controlling authority. *See, e.g.,* Elizabeth Earle Beske, *Rethinking the Nonprecedential Opinion,* 65 UCLA L. Rev. 808 (2018) (arguing that the U.S. Supreme Court's retroactivity jurisprudence of *Harper v. Virginia Board of Taxation* and *Griffith v. Kentucky* "require[s] that any case's new rule apply not only to future litigants but also to those whose cases are pending"); Johanna S. Schiavoni, *Who's Afraid of Precedent?: The Debate Over the Precedential Value of Unpublished Opinions,* 49 UCLA L. Rev. 1859 (2002) (explaining the argument that the U.S. Constitution requires that decisions of

appellate courts have precedential effect).[2] An Eighth Circuit opinion concluding that it was unconstitutional for a court to fail to apply a prior decision was rooted in an examination of the intent of the Framers of the U.S. Constitution and what they understood to be the nature of judicial power. *See Anastasoff v. United States*, 223 F.3d 898, 901 (8th Cir.) (rule that states unpublished opinions are not precedent is unconstitutional under Article III), *vacated as moot,* 235 F.3d 1054 (2000); *see also United States v. Goldman,* 228 F.3d 942 (8th Cir. 2000).

In 2006, the Federal Rules of Appellate Procedure were amended to provide that a court of appeals may not prohibit a party from citing an unpublished opinion of a federal court for its persuasive value or for any other reason. *See* Fed. R. App. P. 32.1(a). The Committee Notes to the Rule further explain that "under Rule 32.1(a), a court may not place any restriction on the citation of such opinions. For example, a

---

[2] *See also* Jessie Allen, *Just Words? The Effects of No-Citation Rules in Federal Courts of Appeals*, 29 Vt. L. Rev. 555, 574–91 (2005) (no-citation rules violate litigants' due process rights); David Greenwald & Frederick A. O. Schwarz, Jr., *The Censorial Judiciary*, 35 U.C. Davis L. Rev. 1133, 1161–66 (2002) (no-citation rules violate the First Amendment guarantees of free speech and the right to petition); Daniel N. Hoffman, *Publicity and the Judicial Power*, 3 J. App. Prac. & Process 343, 347–52 (2001) (no-citation rules violate Article III); Salem M. Katsh & Alex V. Chachkes, *Constitutionality of "No-Citation" Rules*, 3 J. App. Prac. & Process 287, 315–23 (2001) (no-citation rules violate separation of powers because they are not within courts' Article III powers); Jon A. Strongman, Comment, *Unpublished Opinions, Precedent, and the Fifth Amendment: Why Denying Unpublished Opinions Precedential Value Is Unconstitutional*, 50 U. Kan. L. Rev. 195, 211–22 (2001) (no-citation rules violate procedural due process and equal protection under the Fifth Amendment); Marla Brooke Tusk, Note, *No-Citations Rules as a Prior Restraint on Attorney Speech*, 103 Colum. L. Rev. 1202, 1221–34 (2003) (no-citation rules violate the First Amendment's rule against prior restraints). The scholarly literature on unpublished opinions, non-precedential opinions, and no-citation rules is extensive. *See, e.g.*, Gant, *Missing the Forest for a Tree* at 706 n.5 (collecting citations); Coleen M. Barer, *Preface: Anastasoff, Unpublished Opinions, and "No-Citation Rules"*, 3 J. App. Prac. & Process 169 (2001) (surveying cases).

court may not instruct parties that the citation of unpublished opinions is discouraged, nor may a court forbid parties to cite unpublished opinions when a published opinion addresses the same issue." Fed. R. App. P. 32.1(a), notes of advisory committee on rules (2006). In part, this is a recognition of the fact that general principles of equal justice under law and the widespread availability of court documents electronically make the artificial limitation on the precedential value of appellate court decisions potentially an illegitimate exercise of judicial power. *See generally* Gant, *Missing the Forest for a Tree,* 47 B.C. L. Rev. 705 (reviewing history of deliberations over the federal rule change to allow citation of all court opinions as precedent).

Similarly, in 2007, in amending its Rules of the Supreme Court and Court of Appeals upon recommendation of the Arkansas Supreme Court's Committee on Civil Practice and after general public notice and comment, the Arkansas Supreme Court concluded that published and unpublished opinions alike constitutionally should have precedential effect. *See In re Ark. Rules of Civ. Proc.,* 2007 Ark. LEXIS 332 (2007); Ark. R. Sup. Ct. R. 5-2(c).

I believe that we should not suddenly decide that a Court of Appeals opinion designed as one that has precedential value by that court cannot be binding precedent without careful consideration and input from stakeholders concerning the implications of this action for our system of justice. We should continue our institutional deference to the Court of Appeals' expertise in determining which of its

own opinions should have precedential effect, should the practice of non-precedential opinions continue.

## II.    Discretionary Review Improvidently Allowed

The majority has chosen to simultaneously rule on the merits by leaving the Court of Appeals decision in place, yet usurp the role of the Court of Appeals to determine the precedential value of its own opinions by ruling that the Court of Appeals opinion in this case has no precedential value. Our use of the DRIA disposition should be rare. As Justice Harlan wrote over sixty years ago, once a case "ha[s] been taken" it should be "consider[ed] . . . on their merits." *Rogers v. Missouri Pac. R.R. Co.,* 352 U.S. 521, 559 (1957) (Harlan, J., concurring in part and dissenting in part). In part this is because once a court votes on a petition and meets the threshold of votes required to take the case, allowing the objecting Justices to subsequently vote to dismiss the petition would render a court's procedures meaningless. Joan Maisel Leiman*, The Rule of Four*, 57 Colum. L. Rev. 975, 976 (1957). The use of DRIA also amounts to a waste of money, energy, and time. *Id.* In normal circumstances, litigants must assume their case could be dismissed based on newly revealed factors between the time the petition for discretionary review was allowed and the case was decided. But no such intervening events occurred here. In this case, Mr. Molé was given an "empty hearing" and forced to put forth "futile effort" to prove the merits of his case despite this Court never actually reaching them. *See id.* at 989. This raises questions of fundamental fairness.

Traditionally, DRIA's limited use as a disposition has been tied to issues regarding (1) a court's lack of jurisdiction when it first agrees to hear a case, *Forsyth v. City of Hammond*, 166 U.S. 506, 511 (1897) (stating the question of jurisdiction is always open); (2) cases where after agreeing to hear the case the question presented becomes moot, *Texas Consol. Theatres Inc. v. Pittman*, 305 U.S. 3, 4 (1938); (3) cases where no relief is sought by or against the petitioner, *Penfield Co. of Cal. v. Sec. and Exch. Comm'n*, 330 U.S. 585, 589 (1947); or (4) when the petition raises a question that was not actually raised or determined below, *McCullough v. Kammerer Corp.*, 323 U.S. 327, 328–29 (1945). More recently, the United States Supreme Court has also used DRIA when a party " 'cho[o]se[s] to rely on a different argument' in their merits briefing" than the one provided in their petition for writ of certiorari. *Visa, Inc. v. Osborn*, 137 S. Ct. 289–90, 289 (2016) (mem.) ("After having persuaded us to grant certiorari on this issue, however, petitioners chose to rely on a different argument in their merits briefing. The Court, therefore, orders that the writs in these cases be dismissed as improvidently granted." (cleaned up)).

To be sure, none of these reasons apply to Mr. Molé's case. This Court allowed Mr. Molé's petition for discretionary review because it met our criteria under N.C.G.S. § 7A-31, which gives the Court authority to allow a case if "[t]he subject matter of the appeal has significant public interest," the case "involves legal principles of major significance to the jurisprudence of the State," or the Court of Appeals decision "appears likely to be in conflict with a decision of [our Court]." N.C.G.S. § 7A-31(c)

(2021). This case is also not moot, and the petitioner, Mr. Molé, is seeking relief. *See In re A.K.*, 360 N.C. 449, 452 (2006) ("When a legal controversy between opposing parties ceases to exist, the case is generally rendered moot and is no longer justiciable."). There is also no "bait and switch" present, as Mr. Molé provided the same arguments in his brief as he presented in his petition for discretionary review. The only thing that has changed since having allowed Mr. Molé's petition in March of last year is the political composition of this Court.

Choosing to use DRIA as a mechanism to avoid ruling on a case, in conjunction with designating the Court of Appeals' published decision in that same case as without precedential value can be detrimental whenever it is used. However, in cases where the Court of Appeals explores issues of "significant public interest," issues that are "significan[t] to the jurisprudence of the State," or issues opinions "likely to be in conflict" with our precedent, use of these procedures are exceedingly harmful. *See* N.C.G.S. § 7A-31. Because this Court chose to allow Mr. Molé's petition for discretionary review, this Court believed one or more of these principles existed. Mr. Molé's case did not involve a strict application of our precedent. Instead, the Court of Appeals explained that a "strict reading" of *Tully v. City of Wilmington*, 370 N.C. 527 (2018), would have foreclosed Mr. Molé's claim and limited claims arising under *Tully* to the "employment promotional process." *Molé v. City of Durham*, 279 N.C. App 583, 588 (2021). Furthermore, on Mr. Molé's equal protection claim, the Court of Appeals noted it was bound by precedent and "urged" this Court to provide guidance on the

resolution of Mr. Molé's class-of-one Equal Protection Clause claim. *Id.* at 598.

Accordingly, providing a ruling in this case would have allowed this Court to, *inter alia*, affirm or reverse the Court of Appeals on these issues. Under Mr. Molé's Fruit of One's Labor Clause claim, choosing to affirm would have granted workers in North Carolina greater protections by confirming that claims like Mr. Molé's could be brought under that section of our Constitution. *See id.* at 590. Under Mr. Molé's class-of-one Equal Protection Clause claim, this Court could have confirmed again that our Equal Protection Clause grants North Carolinians greater protection than the U.S. Constitution. *See State v. Carter*, 322 N.C. 709, 713 (1988) ("Even were the two provisions identical, we have the authority to construe our own constitution differently from the construction by the United States Supreme Court of the U.S. Constitution, as long as our citizens are thereby accorded no lesser rights than they are guaranteed by the parallel federal provision."); *see also Stephenson v. Bartlett*, 355 N.C. 354, 381 n.6 (2002); *Holmes v. Moore*, 383 N.C. 171, 179 (2022) ("North Carolina's guarantee of equal protection has also been held to be more expansive than the federal right.").

On any issue, this Court could have also chosen to reject Mr. Molé's claims on the merits. By reaching the merits of Mr. Molé's claims and issuing an opinion, the parties would receive an explanation of why their claim was successful or failed, and future litigants would have a foundation from which to bring or defend any subsequent claims. More generally, this Court's opinions also provide the citizens of

this state with guidance on the types of relief available to them, and in this case could alert workers to applicable protections.

Rather than carry out its duty to the citizens of this state, the majority in this instance has shirked its responsibility to be the final arbiter of the North Carolina Constitution, *Lea Co. v. N.C. Bd. of Transp.,* 308 N.C. 603, 610 (1983), and to determine whether a lower court has committed an error of law. *See State v. Brooks*, 337 N.C. 132, 149 (1994) ("After there has been a determination by the Court of Appeals, review by this Court, whether by appeal of right or discretionary review, is to determine whether there is any error of law in the decision of the Court of Appeals[.]"). In more ways than one, this Court has chosen to "sweep" this case under the rug never to be seen again without so much as an explanation. *See* Render, *On Unpublished Opinions* at 164.

The rule of law exists to curb the arbitrary exercise of power. *See The Federalist No. 15* (Alexander Hamilton) (explaining that laws are instituted "[b]ecause the passions of men will not conform to the dictates of reason and justice, without constraint"). Our justice system is protected by "rules that are known today and can be enforced tomorrow." *See* Thomas M. Reavley, *The Rule of Law for Judges*, 30 Pepp. L. Rev. 79 (2002). If rules are uncertain, our justice system will be affected. *Id*. The majority's use of DRIA and its designation of the Court of Appeals opinion as without precedential value both subvert the rule of law by creating uncertainty. This is precisely the type of exercise of arbitrary power the rule of law should guard

against. In this instance, the use of the DRIA disposition deprives the parties, the attorneys who represented them, those who filed amicus briefs in support of one party's position, and the people of North Carolina collectively of these protections. Furthermore, taking from the Court of Appeals the ability to decide which of its opinions have precedential value without otherwise disturbing anything in the opinion is a disingenuous sleight of hand and a dangerous threat to the fair application of the laws to all citizens. Therefore, I dissent.

Justice MORGAN joins in this dissenting opinion.